## ABE HOUSE v. THE STATE.

### No. 1929. Decided June 13, 1900.

**1. Evidence—Defendant's Character.**

In criminal cases, whenever a criminal intent is the essence of the offense, evidence of the general good character of the accused when offered by him is relevant and admissible in his behalf, whether the other evidence has left the case in doubt or not, and it is error to exclude such evidence.

**2. Murder—Evidence by Comparison.**

On a trial for murder, where one of the strongest facts relied on by the State was blood and hair upon one of the barrels of defendant's shotgun, the State's theory being that said weapon had been used by defendant as a bludgeon, and at the several previous mistrials which were had in the case there appeared considerable contradiction in the testimony of the witnesses in regard to the length and color of the hair, defendant's contention being that the blood and hair came from squirrels killed by him a day or so before the homicide, and to test the matter defendant's attorneys procured squirrel hair and some horse hair, and one or more of these witnesses testified that the squirrel hair was human hair but expressed doubt as to the horse hair, upon which counsel proposed to have the jury inspect this hair, which the court refused in a manner to reflect upon counsel; Held, error; the jury should have been permitted to examine the hair which had been used in connection with the testimony of the witnesses.

**3. Conduct of Judge on Trial—Practice.**

Reflections upon counsel should not be indulged in by the court when passing upon questions of evidence.

APPEAL from the Criminal District Court of Dallas, on change of venue from Ellis County. Tried below before Hon. CHARLES F. CLINT.

Appeal from a conviction of murder in the first degree; penalty, imprisonment for life in the penitentiary.

The appellant was charged in four counts by the indictment with the murder of Frances Cervinka, on the 19th day of July, 1893. First, by striking her on the head with a shotgun; second, by striking her upon the head with a hard substance; third, by choking her with his hand and striking her on the head with a gun; fourth, by striking her upon the head with a gun, defendant at the time being engaged in the attempt at the perpetration of rape.

The following brief statement of some of the prominent facts is taken from appellant's brief:

Frances Cervinka, a Bohemian girl about seventeen years of age, lived with her father, Charles Cervinka, about five and one-half miles west of Ennis. On the 19th of July, 1893, about 1 o'clock she left home to water a horse at the Waxahachie Creek, about 900 yards north

of her father's house. About 2 o'clock on that day the horse was seen near the edge of the bottom and search was made for her when her body was found in the creek, between 2 and 3 o'clock of that day, at a point near the bank on which a tree stood. The next day about 10 o'clock a number of men, having been to the scene of the homicide, went to the house of appellant, which is west from the home of deceased and in his absence searched his premises which were occupied by himself, wife, and her father and a boy about twelve years of age. At the time of the search appellant and his wife were absent and upon his return that day he was arrested by the sheriff of Ellis County as being suspected of the murder and was hurried away to avoid capture by the mob and was first taken to the Dallas jail and then to Fort Worth jail and then in September following was taken to Waxahachie jail. On the first Monday in October his examining trial began which resulted in his being allowed bail in the sum of $2000. At the January term of the District Court of Ellis County he was charged by indictment with the crime of murder, committed with some blunt instrument and in the perpetration of the crime of rape. He was put upon final trial at that term, resulting in a mistrial, the jury standing eleven for acquittal and one for conviction. At the June term of said court 1894 he was again tried resulting in a mistrial, the jury standing eight or nine for acquittal. At the January term, 1895, of that court the Hon. Judge Dillard of his own motion changed the venue to Dallas County. The case remained on the Docket in Dallas County with the appellant on bond and without being called for trial for two years, to wit, until February, 1897. His motion to recommit the case to Ellis County upon the grounds that it was illegally changed and because of the great race prejudice in Dallas County being overruled he went to trial before his honor, Judge Clint, which resulted in his conviction of a life sentence. His motion for a new trial being granted. The case then stood until June, 1898, when his motion for a continuance was overruled and the trial resulted in his conviction of murder in the first degree with a life sentence, only one degree of homicide being submitted in each trial.

Substantially as shown by the record the theory of guilt as advanced by the State consists of the following circumstances, to wit: On the right side of deceased's head there was a lateral wound about two inches long where the skull was crushed and it being in the hardest part of the skull it required an exceedingly hard blow to have caused it, the wound being made with some kind of a blunt instrument. The kind of instrument the doctor would not say or intimate but that it was a blunt one. The appellant's house consisting of one room and a shed room, was searched the day after the homicide in the absence of himself and wife and the gun was found as testified to by some witnesses lying across two joists but in full view and in easy reach and by other witnesses the gun was found in its usual place in the gun rack above

the door. What resembled blood was seen on different parts of the gun as the fancy of this or that witness helped his memory; some saw the blood in one place, some in another; some discovered as many as two or three fine hairs matted in blood, light colored hairs resembling the hair of deceased; other witnesses did not see any hairs or the blood on the side of the gun where the hair was matted in it. There is a radical difference as to who first took the gun down, who first examined it, as well as the number of stains and the position and condition of the stains; however, they all agreed that the stains were dry and couldn't tell how long they had been there or the kind of blood. Some of the witnesses testified to having found a green leaf under the break of the gun, some said it was ash, another said it was elm and another it was hackberry. They all agree that the stains called by them blood stains as well as the leaf under the break could be seen by one person as well as another, the owner not excluded. Hanging on the wall was a dark colored vest with dry stains resembling blood and the cloth of the vest absolutely dry. Down in the bottom of the trunk was found a shirt rolled up and which bore the appearance of having been washed and wrung out; this also had stains on it; one witness testified that it resembled iron rust to him. Between the wall and the front door was found a pair of gum boots with some mud on the bottoms that resembled the mud in the creek bottom. Hanging on a pole projecting from the smokehouse was a pair of old ducking pants wet up to the waistband and some dry stains taken to be blood stains were seen on them. At a point near the edge of the bottom on the road leading from deceased's house to the crossing is a tree, around this tree were noticed the tracks of a horse as if he had been standing some time. At about thirty-five or forty yards from the tree the tracks of this horse were discovered going up to the appellant's horse lot. These tracks were made after the rain and were not seen until after the day of the homicide. Near the slough, close to the road leading to the bottom and the crossing, were tracks as if made by a gum boot—these went to the creek and back to the edge of the bottom and were seen on the 20th day of Judy and made since the rain on the day previous.

The matter pertaining to the introduction of squirrel and horse hair and the action of the trial court in relation thereto, is fully stated in the opinion.

*Stilwell H. Russell, W. S. Lemmon,* and *A. J. Hudson,* for appellant, filed an able argument in the case.

*Rob't A. John,* Assistant Attorney-General, for the State.

DAVIDSON, Presiding Judge.—Appellant was convicted of murder in the first degree, and his punishment assessed at confinement in the penitentiary for life.

Ellis House, owner of defendant when a slave, testified that the general reputation of appellant in the community in which he, lived was good for peace and quietude; that he was a law-abiding citizen, and that his reputation was good as well for truth and veracity. Defendant failed to testify in his own behalf, whereupon the county attorney moved to exclude the evidence of the witness in regard to his character for truth and veracity. The court not only excluded this phase of the testimony, but also that which related to peace and quieture. As a reason for admitting the testimony as to veracity, the court informed the jury that he expected testimony would be offered which would make said evidence pertinent; but, this not having been done, the evidence of the witness was excluded from their consideration, "and it was all put out;" not only that with reference to truth and veracity, but also as to character for "peace and quiet." Exception was reserved to this action of the court. It is not necessary to discuss the ruling of the court with reference to the exclusion of the testimony in regard to appellant's character for truth and veracity. In criminal cases, wherever a criminal intent is the essence of the offense, evidence of general good character of the accused as a law-abiding citizen is relevant, and therefore admissible in his behalf, and is to be considered by the jury as any other evidence in determining whether or not his guilt has been established beyond a reasonable doubt. This character of testimony is always admissible in his behalf whether the evidence leaves the case in doubt or not. Of course, this can only be put in issue by defendant. For collation of authorities, see White's Ann. Code Crim. Proc., sec. 1092, subdivs. 2, 3. The court's action was clearly error. Why this testimony was excluded is not explained by the bill, if in fact it could be explained.

This case depended upon circumstantial evidence. One of the strongest facts relied upon by the prosecution was the finding of what the witnesses thought to be blood on one of the barrels of a shotgun. The theory of the prosecution was that this gun was used as a bludgeon in the perpetration of the homicide. Some hair was connected with this blood. The case was tried several times, resulting each time in a hung jury, until the last trial. This "blood and hair" theory was the subject of investigation upon each. The testimony grew stronger at each recurring trial in regard to the hair. Upon the first trial the hair was said to have been very short, and of a dark color. At the succeeding trial it was a little longer, and of a little lighter color; and finally upon the last trial it had grown to be three or four inches in length, and of a decidedly light color. These witnesses were contradicted upon the last trial by their evidence upon former trials. On the last trial one of appellant's attorneys, to test this matter, secured several hairs from the tail of a stuffed squirrel, and others from the mane and tail of a horse. These were exhibited to the jury in connection with the testimony of these witnesses. One or more of them testified that the hair

from the squirrel was human hair, but expressed some doubt in this respect as to the horse hair. Under this state of case, counsel for appellant proposed to hand the jury the hair, and let them personally inspect it. This was refused by the court, and in such manner as to decidedly reflect upon the counsel who obtained the hair. The court then took the hair, inclosed it in an envelope, and ordered it to be kept by the clerk. The court, in explanation, says: "The hairs were put in an envelope to preserve them separately, to enable the court and jury to identify the hair as testified to by Sparkman. The court refused the jury to inspect the hair before retiring with the case, not as it always does any like evidence in any case." It is a little singular why the hair should have been inclosed in an envelope for the purpose of being identified by the jury, when they were absolutely prohibited from even seeing or inspecting it. Nor does the court explain why this rule was different in this case from his rule in other cases. Whenever it serves any purpose in the case, all such testimony as clothing, diagrams, documents, and evidence of that character shall be permitted to go to the jury; and we see no reason why this testimony should have been excluded, or this case furnish an exception to the rule. For collation of authorities in this respect, see White's Ann. Code Crim. Proc., secs. 1074, 1075. The contention of appellant was that, if blood and hair were found upon the gun, it came from squirrels killed a day or two prior to the homicide. If this was true, one of the most potent facts, if not the most cogent fact, in the case was elucidated and eliminated. This was very important evidence for the appellant. The action of the court with reference to the matter should not have so occurred. It was error. The judge may violate the provisions of the procedure as well by actions as by words, and he must not convey to the jury any criticism calculated to injure the rights of the accused any more by acts than by words in regard to the testimony of the witnesses; hence his reflections upon counsel should not have been indulged. For the action in regard to the matters discussed, the judgment is reversed and the cause remanded. The testimony is of a very inconclusive and unsatisfactory character.

*Reversed and remanded.*