### Thomas Sanchez v. The State.

#### No. 1884. Decided June 26, 1912.

**1.—Murder—Evidence—Photographs.**

Upon trial of murder, there was no error in introducing in evidence photographs taken at the scene of the homicide the next morning, showing the position of the buggy and the dead body of the deceased therein, and such environments as were included in the picture, as the same threw light upon the transaction.

**2.—Same—Evidence—Pistol Found.**

Where testimony had been introduced showing that defendant admitted that he gave a pistol to a third party after the shooting, there was no error in introducing testimony that a pistol was found at the barn of the deceased which was sufficiently identified as that used by the defendant.

**3.—Same—Charge of Court—Self-Defense—Relative Strength of Parties.**

A charge with reference to the relative strength of the parties, their character and disposition, etc., should never be given except where the facts call for it, and where, upon trial of murder, the facts did not call for such a charge it should not have been given.

**4.—Same—Charge of Court—Self-Defense—Statutes Construed—Confessions.**

Where, upon trial of murder, the written confessions of the defendant showed that deceased made an attack on him with an open knife saying that he and defendant were going to have it tonight, the court should have given in charge the statutory provision of article 1105, Revised Criminal Code, with reference to the acts or words of deceased; as the State was bound by said written confessions unless they were disproved, and a general charge on the subject of self-defense was not sufficient under the evidence.

Appeal from the District Court of Goliad. Tried below before the Hon. John M. Green.

Appeal from a conviction of murder in the first degree; penalty, death.

The opinion states the case.

No brief on file for appellant.

*C. E. Lane,* Assistant Attorney-General, for the State.—On question of introducing photograph: Powell v. State, 50 Texas Crim. Rep., 592; Lindsey v. State, id., 435; Newcomb v. State, 49 id., 557; Willis v. State, id., 145; Young v. State, id., 213.

DAVIDSON, PRESIDING JUDGE.—Appellant was convicted of murder in the first degree, the jury assessing the death penalty.

The evidence discloses that appellant was living in the same house with the deceased, the deceased being a married man, appellant unmarried. On the evening of the homicide deceased had been to the residence of Mr. Parks for the purpose of obtaining some staples to fix the fence of Mr. Parks, deceased being a tenant on the place and had been for years. The distance between the residence of Mr. Parks and the domicile of deceased was about two miles. When deceased left his home en route to Mr. Parks, appellant had just returned from a railroad station called Fannin. There was a short conversation between deceased and appellant, deceased going on to Mr. Parks, and appellant remaining at the residence of the deceased. Shortly afterward appellant left the house on foot. He was seen by several parties between the two residences of deceased and Parks. One of the parties undertook to approach him and appellant ran away and secreted himself. Deceased's body was found in his buggy with two pistol balls in the right side of his head, one nearer the right ear than the other, but both in front of the ear, one passing out on the left side of the head. The body was in the buggy at the time with his head thrown back over the back of the seat, it being a buggy without a top. The body was nearer the left side of the buggy than the right side. The left hand was down on the arm or the cushion of the buggy, the right hand being on the cushion on the right side of his body with about a half consumed cigarette held between two fingers of the hand. The horse had been taken from the buggy, and the harness thrown on the shafts or about the buggy. This was the

position of the buggy and the body at the time the State witnesses, sheriff and others found it the morning after the homicide. Deceased's horse was ridden to the residence of the deceased by appellant. A pistol was found at the barn supposed to have been placed there by appellant. This pistol is supposed to be the one appellant used. The State's case, therefore, up to this point was one of circumstantial evidence. All the facts and circumstances are not undertaken to be given, but only a general outline of the theory of the State. There are two other facts that should be mentioned: when he was arrested the next day appellant had in his possession the knife which belonged to deceased. On the night of the homicide when he returned to the residence of the deceased appellant turned over to the wife of deceased some money with the request that she keep it for him. There are facts and circumstances showing the illicit intimacy between the wife of deceased and appellant.

The State, to relieve the case of circumstantial evidence we suppose, introduced the written confession made by appellant to the county attorney. To this no objection was urged. This confession connects appellant directly with the killing and he makes the statement that he fired the shots which killed deceased. He says:

"I was working for old man Antonio Urrea, and had been there a couple of weeks. His wife, Maria Urrea, commenced coming into my room in the night and playing with me. I told her several times that she had better quit coming in there as she was a married woman and I didn't want to fool with her that way. She kept coming in there anyway. Old man Antonio found her in there one morning and got after her. She told him she was just fixing some clothes. A day or two after that Antonio jumped me about his wife being in my room. I told him to ask her about it and she could tell him about it better than I could. I told Antonio that I wasn't doing anything to her. She was lying to the old man Antonio by telling him that she hadn't come to my room at night. I was having intercourse with her all the time. The day Antonio was killed I was going to Goliad to spend the night. It was Saturday. Antonio met me at his gate as I was going in and he was going out. I was coming from Fannin. He told me that he wanted to see me that evening. I told him all right. He asked me if I was going anywhere that evening and I told him I was going to Goliad. He told me to wait for him at the black bushes on the road from Parks' house to Antonio's house, a little ways from the corner fence east of the negro Lewis' house. I went there and waited for him. I walked there. When I met him there Antonio said 'Why didn't you ride one of my horses' and I told him I might be away a day or two and that I didn't want to keep his horse away so long. I had seen the negro man out on the prairie before that. I didn't know who he was. Antonio and I rode together in Antonio's buggy towards Goliad, across the creek and past Parks' house. Antonio got after me about

having something to do with his wife. I told him that I had told him once before to ask her, that she was the one to tell the truth. She never did tell Antonio anything about it. She never did bring it up. Antonio told me that his wife wouldn't tell it, even if he would kill her. I told Antonio I would rather leave his place than to get into trouble. He turned around and said, 'Me and you are going to have it tonight.' And then struck at me with his knife. The knife was open. We were still in the buggy then and I grabbed his wrist and then jumped out of the buggy and then shot at him. I shot twice. I don't know whether I hit him or not. I took Antonio's horse out of his buggy and rode him back to Antonio's house. I went in and told Antonio's wife about it. I told her I was going to town and give up and plead guilty to what I had done, and she didn't want me to come. She told me to stay there with her until they come and got me. She was the cause of my getting into this trouble. She said that she could stand the trouble as well as I could. She said that it wouldn't make any difference if they would bring her along with me. She had told me time and again that she didn't care about trouble as long as I stayed with her. She had told me that if ever Antonio jumped on me for me to defend myself and to shoot Antonio. Pancho Cabrera let me have this pistol, a 32 or 38 I don't know which. I gave Pancho the pistol and the bridle and reins that night. When I got back after shooting Antonio, Pancho was at the pen with the mules when I got back and gave him the pistol and bridle. Pancho and Antonio's wife were the only two that I told about killing Antonio. Pancho bought the pistol and cartridges in Victoria along about September. I gave some money to Antonio's wife that night. Antonio's knife fell on the ground after I shot him and I picked it up and put it in my pocket. Mr. Handley took this knife from me after I was arrested. After I left Antonio in the buggy by the road I did not see any one. When Antonio and I was coming by the negro Lewis' house we passed several buggies, two I think, we spoke to one of the buggies.

"This statement is the truth and is a voluntary statement.

"Witness my hand this 1st day of January, A. D. 1912.

Thomas Sanchez."

1. Appellant introduced no evidence, and the case rested upon the State's testimony. A bill of exceptions was reserved to the introduction of the photographs taken at the scene of the homicide the next morning, showing the position of the buggy and the dead body, and such environments as were included in the picture. Objection was urged to the introduction of these photographs. We are of opinion this was not error. Wherever the introduction of photographs and diagrams serve to illustrate a question in the case or to throw light upon the transaction, it is permissible to introduce same in evidence.

The authorities are quite numerous to sustain this proposition. For a collation of Texas cases see Branch's Criminal Law, section 362. The rule laid down in this State seems to be the universal rule.

2. There is another bill of exceptions reserved to the introduction of the pistol found at the barn of the deceased. The bill itself recites that the court erred in allowing the State to introduce over the objection of the defendant, a pistol, to which ruling of the court defendant excepted, and then follows the grounds of objection. The bill is insufficient to bring this matter in review, but as qualified by the judge there is no error shown in the admission of this pistol before the jury. Just why it should be admitted is not exactly perceivable, but it amounts to little either way. It does not assume to prove any fact except it was a pistol. It had been admitted by appellant that he gave the pistol to Pancho at the barn where it was found, and it seems to be sufficiently identified as the pistol belonging to Pancho and the one used by appellant. This is deducible we think from the confession or statement of appellant himself.

3. The court charged the jury on self-defense, among other things, with reference to the relative strength of the parties, and the character and disposition, etc. Objection was urged to this phase of the charge. The only particular part of this phase of the charge to which objection was urged was that with reference to the relative strength of the parties. We are of opinion that the court should not have charged, under the facts of this case, with reference to the relative strength of the parties, their character and disposition, etc., and that such charge should never be given except where the facts call for such charge. We have had occasion to reverse quite a number of cases for giving this character of charge. In some cases it is proper to give it. In some cases it is called for and demanded by the evidence. It is impossible to fix a stereotyped charge that will cover all phases of a case on any subject, and the trial courts should keep in mind that the charge should always be applicable to the facts of the particular case on trial. While it might not be reversible error in this particular case, that the court charged on the relative strength of the parties, yet we caution the trial court, in view of another trial, that if the facts are the same upon it as upon this trial, this phase of the law should not be given.

4. Appellant requested a special instruction with reference to the law of self-defense, which was refused by the court. The charge embodied the statutory provisions of article 675 of White's Annotated Penal Code, now article 1105 of the Revised Criminal Code. It is there provided that "it must reasonably appear by the acts or by words, coupled with the acts of the person killed, that it was the purpose and intent of such person to commit one of the offenses above named. The killing must take place while the person killed was in the act of committing the offense, or after some act done by him

showing evidently an intent to commit such offense." The prior portion of that article as applicable to this charge reads as follows: "Homicide is permitted by law when inflicted for the purpose of preventing the offense of murder, rape, robbery, maiming, disfiguring, castration, arson, burglary, and theft at night," etc. The court gave a general charge to the effect that if appellant was attacked, or it reasonably appeared to him, viewed from his standpoint, that he was in danger of losing his life, or being seriously injured, they would acquit. The special requested instruction asked the court to apply the act of the Legislature set forth and above quoted, which the court promptly declined. We are of opinion the court should have given this charge. It is part of the statutory definition of self-defense, and directly called for by the facts of this case. The State had put in evidence appellant's confession to the effect that the deceased made an attack on him in the buggy with an open knife, and said to him, "Me and you are going to have it tonight." Here were the acts and the words accompanying the acts on the part of the deceased, of his purpose and intent to take the life of appellant or do him serious bodily injury. This was placed in evidence by the State. This testimony, therefore, was binding upon the State unless disproved. This question has been so often decided it would seem like surplusage and work of supererogation to cite cases. The cases commencing with Pharr v. State, 7 Texas Crim. App., 472, lay down the proposition that whenever the State puts in the declarations or confessions of an accused, which are exculpatory, it devolves upon the State to disprove the same. The court recognized this, and in a qualified manner so instructeed the jury. However, that did not relieve the court from giving the special requested instruction under the statute quoted to the effect that if the danger arose to appellant, viewed from his standpoint, by the acts or words, or both, and he killed in defense of himself from the attack made by deceased with a knife, he would be justified. That the jury may not have believed this testimony, and that the court did not believe it, does not change the question or the legal right of the accused. The conclusion to be formed from the facts is for the jury, not the court. The court is to give the law and must give the law applicable to the evidence introduced. The charge insisted upon the statutory right of self-defense such as is expressly provided by legislative enactment. The charge to the jury does not depend upon the belief of the court as to the value or weight of the testimony, but depends upon the fact that the testimony is in the case.

For the error discussed the judgment is reversed and the cause is remanded.

*Reversed and remanded.*