## Z. B. POUNDS v. THE STATE.

### No. 5937. Decided May 11, 1921.

**1.—Murder—Evidence—Remarks by Court—Child Witness—Practice in Trial Court.**

Where, upon trial of murder, one of the State's witnesses was a child, who testified probably for the first time, there was no error in the remarks by the trial judge to the witness that she take plenty of time and answer the questions, the purpose of the court being to quiet her in order that she might not become excited and to assure her that no harm would befall her, etc.

**2.—Same—Evidence—Witness Under Rule—County Attorney.**

Upon trial of murder, there was no error in permitting the county attorney, who was assisting the counsel for the State, to testify as a witness for the State, after he had been sworn with the other witnesses and ordered placed under the rule, but remained in the courtroom assisting the State. 89 Tex.—18

**3.—Same—Evidence—Instrument Used.**

Upon trial of murder there was no error in permitting a State's witness to testify as to finding and taking possession of a hammer in defendant's barn, some twenty-four hours after the injury was inflicted upon deceased, and describing the condition thereof, with reference to blood and hair upon it, etc. Following Young v. State, 49 Texas Crim. Rep., 207, and other cases.

**4.—Same—Argument of Counsel—Implement Used.**

Where, upon trial of murder, it was the theory of the State that the defendant committed the murder by using a hammer in striking deceased on the head, etc., which implement was in evidence, there was no error in the language of the State's counsel in saying: "and by imagination transplant yourselves with the bloody hammer and the whisp of mother's hair, and standing at the lonely grave of this mother, write your verdict." Following Tweedle v. State, 29 Texas Crim. App., 591, and other cases.

**5.—Same—Argument of Counsel—Response to Counsel's Argument.**

Where it appeared from the bill of exceptions that defendant's counsel had told the jury, in his argument that if defendant had anything against him the jury knew the District Attorney would have brought it out, to which State's counsel replied that the State could not have done so under the rule that the defendant must first put his character in issue, there was no reversible error. Following Sinclair v. State, 35 Texas Crim. Rep., 130, and other cases.

**6.—Same—Argument of Counsel—Implement Used.**

Where, during the closing argument the district attorney took the hammer which was in evidence and said: "I do not know who explained it better than Dr. Cummings, himself, who, on cross-examination said: 'No, no, it occurred to me that she had been pecked." (meaning the deceased). 'You notice it from ear to ear with a blunt instrument like this,'" the argument being based upon the facts in evidence, there was no error.

**7.—Same—Argument of Counsel—Charge of Court—Bill of Exceptions.**

Where, upon trial of murder, the State's theory was that defendant had killed deceased with a hammer, by knocking her in the head, and the defendant's theory was that she was kicked by a mule, there was no error in the State's counsel's argument, using the language, "Has the defendant established to a reasonable and moral certainty that the deceased was killed by a jack?," it not appearing by the bill of exceptions the connection in which this is used, and the court having already instructed the jury upon this phase of the case.

**8.—Same—Sufficiency of the Evidence.**

Where, upon trial of murder, the evidence against the defendant, although wholly circumstantial, was sufficient to sustain the conviction, under a proper charge of the court, there was no reversible error.

**9.—Same—Rehearing—Argument of Counsel—Implement Used.**

Where, upon trial of murder, there was before the jury evidence that the skull of the deceased was fractured in a number of places, and that by a number of blows with some blunt instrument numerous wounds had been inflicted, and that a certain hammer was in evidence, found near the scene of the homicide, spattered with blood and hair, etc., there was no error in the State's counsel's language, "it occurred to me that she had been pecked from ear to ear with a blunt instrument like this," etc.

Appeal from the District Court of Haskell. Tried below before the Honorable W. R. Chapman.

Appeal from a conviction of murder; penalty, ten years imprisonment in the penitentiary.

The opinion states the case.

*J. A. Dial,* and *H. G. McConnell,* for appellant.—On question of argument of counsel: Davis v. State, 114 S. W. Rep., 366; Boozer v. State, 198 id., 295.

*Alvin M. Owsley,* Assistant Attorney General, for the State.—On question of remarks of court: Wragg v. State, 145 S. W. Rep., 343; Stapp v. State, 144 id., 941.

HAWKINS, JUDGE.—Appellant was convicted for the alleged murder of his wife, and his punishment assessed at confinement in the penitentiary for a term of ten years.

The case is one of circumstantial evidence wholly. The theory of the State is that appellant killed his wife with a hammer; that of appellant that wounds in her head from which she died were inflicted by the kick of a jack. Around this pivotal point all the evidence in the case revolved. The counsel for appellant earnestly insist that the evidence is insufficient to support the finding of the jury, and because of this we give a more extended statement of facts than we would otherwise feel called upon to do. Appellant, his wife, and her two children by a former marriage, were living in the little town of Rochester in Haskell County. He was running a restaurant, and during the day his wife helped him about his place of business. The two children were attending school. It appears that it was their custom to eat breakfast at home and generally to have supper at home. Appeallant and deceased had only been married a few months. Prior to their marriage she had lived at Spur in Dickens County.

The only motive for the killing is disclosed in the testimony of the witness, E. P. Carr, who was distantly related to deceased. This witness testified that a few days before the killing he was in appellant's restaurant when the two little children came in and their mother gave them something to eat, and that after they went out the appellant spoke to his wife and told her she gave the children too much to eat these hard times and it would break up a rich man; and that deceased replied to him that if he was not satisfied with her and her two children that she would go back to Spur. He says they were not quarreling when he came into the restaurant, but the dispute came up after the children had eaten their dinner and gone back to school; that during the day before the killing of the deceased that night he was passing by appellant's restaurant and appellant called him and told him he and his wife had been discussing finances, and he demonstrated by the use of some dishes and light-bread what he was called upon to furnish to the family in the way of things to eat, and said substantially, "Now, he says, look, when I was by myself I had two

biscuits to furnish; now its from sixteen to twenty-four." The wit-·
ness told appellant that he did not care to hear any further talk about
it, as he had nothing to do with it; that deceased at the time was cry-
ing, the tears streaming down her cheeks, and she said upon that oc-
casion about what she had a few days before, that "if he was dissatis-
fied with her and her two children she would go back to Spur; that
they had to eat, and that he, appellant, knew it before he married her,
and that she had the girls, and that if he was not satisfied she was
willing to go back to Spur with the children. This witness says upon
another occasion he went into the restaurant and found deceased cry-
ing and that she and appellant seemed to be in discussion with refer-
ence to a Mrs. Trammell, who had recently died; appellant was con-
tending that Trammell was the best off, that he could now go ahead
and live a happy life; deceased was contending that the woman was
the best off, because she was through with her troubles in this world.
The testimony of this witness was attacked in various ways by the
appellant. He proved by witnesses that Carr had said on another oc-
casion that he had done the appellant an injustice and that he and
his wife were not quarreling; and also attempted to show in a nega-
tive way that the relations between appellant and his wife had been
pleasant. This was shown by witnesses who went into the restaurant
to get their dinner, who testified they had never discovered or noticed
any unpleasant relations between them, and by one witness who owned
the building in which appellant was running his restaurant, and who
occupied part of the building itself, and who stated he had no oppor-
tunity to observe their relations, and could hear them in the restaurant
talking, and that he had never discovered any unpleasantness between
them.

Appellant had two jacks which he kept at his home and used them
in operating what he called a "service barn." One of them was known
as the "old jack." He seems to have kept them in separate stalls, and
in watering them would turn them out separately in order to prevent
them fighting. It seems to have been·a custom for the deceased to ac-
company her husband to the barn when he went to feed; and she
would attend to gathering up the eggs while he was feeding and at-
tending to the jacks. It also seems from the testimony to have been
a custom for the little girls to frequently accompany them to the
barn. Birtie Lee Pounds, the oldest one of the children, who was
eleven years old at the time of the trial, testified, that upon the night
her mother was injured appellant and deceased did not go to the lot
until after supper, and as they got ready to leave her mother asked
her if they wanted to go and she answered "Yes," that appellant told
her, "No, that they must stay at the house tonight and study their
lessons." This was denied by appellant, and was also controverted
by another witness who claimed that the little girl afterwards said her
mother told them to stay at the house and get their lessons. She
further testified that it was their custom to carry a lantern with them

when they went to the lot after dark, but they did not carry one on the occasion in question; after they had been gone for perhaps thirty minutes she heard her mamma holler once or twice, saying, "Oh, me;" that when she went to the door and opened it the appellant called to her and told her, "Run get the doctor, something is catching your mother." Appellant admits having called the child, but denies having told her "something was catching her mother," and says what he did tell her was that the "jack had kicked her mother" and to run get the doctor. Whatever the appellant said to the child, she evidently understood him to say, "Something was catching her mother," because the witness, Mrs. Crume, the wife of the first doctor to get to the barn, and who lived near, testified she heard the child tell Dr. Crume this same thing, and it developed in the cross-examination of this child that she had testified to the same facts on the *habeas corpus* hearing. On one side of the barn there seemed to be a small lot, some ten or twelve by twenty feet, in which was situated a water trough, and on the other side of the barn was a large lot in which were the stalls where the jacks were kept.

A witness, B. C. Hardin, testified that he lived near appellant's house, and some time after dark he heard some calling, but at first paid no attention to it, but afterwards recognized appellant's voice, and he was calling for him to come on down there; when he got to the lot appellant was standing in the small lot in front of the door of the barn, and he asked appellant what was the matter, and he replied, "I think a jack has kicked my wife and nearly killed her;" that she was lying in the hallway of the barn, her feet near the door, perhaps extending a little on the outside of the door; no one was there at that time except appellant, deceased, and Dr. Crume, who seemed to have gotten there a short time before this witness; they had no lights and this witness went back to get a lantern or light of some kind. This witness stated that after returning to the barn with the lantern and when he started to set it down he noticed a claw hammer lying there that had blood on it, and that he moved the lantern so as to get it away from the hammer and did not disturb the hammer in any way. He described the hammer as lying a little to the right of the body of the deceased, about even with her shoulders. This witness stated that at the time he got to the barn there was nothing in the small lot; there was no jack in there at that time. He said at the time he noticed the hammer that there was blood all over it, on the handle and all over it from one end to the other, that he did not pick it up or call anybody's attention to it; that the hammer was not concealed; there was nothing over it at the time; there was some trash that had accumulated in the hallway of the barn and the hammer was lying on the top of that. The witness, Carr, whose testimony has been referred to heretofore, testified that he told appellant, after noticing the wounds on the head of deceased, that he thought they ought to have a surgeon, and wanted to get Dr. Dunn, but appellant told him that Dr. Crume could do all

that was necessary to be done.  It seems the relations existing between Dr. Crume and Dr. Dunn were not very pleasant and this witness asked Dr. Crume to send for Dr. Dunn, and his reply was not very complimentary, but the witness sent for Dr. Dunn anyway.  After Dr. Dunn came and was dressing the wounds the witness Carr says he counted fifteen wounds on the head of deceased, that he might have made a mistake, but he counted fifteen, all in the edge of the hair, with the exception of one across the nose and one just behind the ear. This same witness testified that on the next night after the killing he and some other parties went to the barn and he saw a part of the handle of the hammer sticking out from under some hay or straw and upon picking it up he saw that it was bloody and there was some hair upon the handle, and it was laid down until the officers could come; that some of the hair was taken off the handle and put in envelopes. He says the hammer was bloody, handle and all.  The witness, Tom Bingham, testified that he remained at the appellant's house during the night after his wife was wounded, and the next morning he and some other parties went to the barn and appellant went down and unlocked the door of the barn, and he saw some blood on the floor and a hammer lying in the blood and that appellant remarked when he unlocked the door, "I reckon I had that hammer fighting that mule off, that was a pretty short thing, wasn't it?"  The witness says the time he went to the barn was early in the morning after the night that deceased was wounded, and the hammer was lying where there was a kind of a puddle of blood, the hammer lying in the blood.  This witness testified further that the appellant stated to him, in substance, that he must have fought the jack off with the hammer, but said he was excited; that he did not know what he had; told the witness that at the time the jack kicked his wife he was in the barn putting up the half bushel; that his wife went to scare the jack back, and the jack kicked her.  The witness testified that as he was going to the barn with the appellant he asked him, "What did you have whipping that mule off with?" and he replied, "I don't remember, I had a pole or bar or something, I don't know just what;" and after they got to the barn and appellant unlocked the door and the hammer was lying there, he said, "I reckon I had that hammer, that is a mighty short thing to whip a mule off of anybody with."

After the hammer with the blood upon it was discovered an investigation was made by more than one witness with reference to the conditions existing in the small lot and all testified there were a number of little puddles of blood in the lot, and blood was spattered on the fence from about eighteen inches from the ground clear to the top, which was about as high as a man's shoulders; there were some few drops or spatters on the water trough.

Other witnesses testified that they not only examined thae lot, barn and the fence, but they examined the jack which appellant claimed had kicked the deceased, and found no blood anywhere on him except

a little skinned place on his nose or head; that no spatters of blood appeared upon him. There was some controversy with reference to the condition of the feet of this jack. Witnesses who examined them claimed that the bottom of them were smooth, that there were some rough places on the hoofs, between the hair and the bottom of the foot, but no projections upon the bottom of the hoof.

Witnesses were called by appellant, who testified that some time later they noticed the feet of this jack, and there was some conflict about the testimony; some testified they were smooth on the bottom, others that they were rough; and others that they were rough between the hoof and hair.

The appellant claimed and testified that after he had fed the jacks on the night in question, he left the gate open so the old jack could come through to get water and that as he and his wife returned from the vacant stalls where she gathered the eggs he stepped into the barn to put away the feed basket, and heard his wife speak to the jack, and tell him to get away, and when he looked back she was stooping down as though to pick up something to hit him with and that the jack kicked her in the head, and she fell forward on her hands and knees and he kicked her again, three or four times, before he could fight him away from her; that he finally got around to the head of the jack and fought him away and began to call for help, as he started from the small lot the jack came back into the lot again, and that he picked up his wife and carried her and laid her down in the hallway of the barn, and again started for help, calling, and he noticed the jack coming back the second time, and that he ran him back and closed the gate and continued to call for help until Dr. Crume and Mr. Hardin came.

All of the Doctors who examined the deceased agreed that there were no wounds or bruises about her person except upon the head, except one small skinned place upon the hand. Appellant testified, accounting for the presence of the hammer where it was found in the barn, that he kept it in the barn just inside the door. Other witnesses in the case testified that appellant had said, "he fought the jack away from his wife with a pole or club."

The testimony up to this point, and the presence of the hammer with the blood on it, could be all accounted for in a matter consistent with the appellant's innocence; but we apprehend the turning point in the case, and the one upon which the jury largely based their verdict was the testimony of the physicians with reference to the character of the wounds. Without undertaking to set out in full the testimony of the Doctors, we will try to select from the statement of facts that portion of the testimony which bears upon this issue. Dr. W. H. Dunn testified in substance: "I found quite a number of wounds on deceased's head, principally on her forehead and the front part of her head. From an examination of the nature of the wounds I found her skull fractured every place that I examined; and I proceeded to remove some loose skull from a few of the wounds. Upon further ex-

amination I found the entire skull was broken up so much that I did not deem it practicable to remove it all. When I first examined her I did not count the number of wounds on her head; I counted them afterwards, in company with others, and there were fifteen of them. There were wounds on both sides of her head; they ranged from ear to ear, across the front above the eye-brows; there was one opposite the eye in the temple, and one very slight wound on the corner of the eye, and one on the side of the nose, just a little flesh wound. After the death of deceased I held the post mortem examination in company with Dr. Cummins. We made an incision across the crown of the head and down the center and exposed the skull and found the skull completely fractured from one ear to the other, how many fractures I do not know; it was just a mass of fractures, the whole thing was just broken up in very small pieces, I do not think any piece larger than a dollar. The flesh wounds went through to the skull. Some of them were depressed and some of them were not. One wound seemed to be more depressed than the rest, the bone seemed to be a little deeper imbedded; there was a piece of bone probably one inch across depressed in the center about where that wound was, most of this bone was not depressed, while there were places that they were depressed. There were several wounds in and about the region of the forehead; there was one which seemed to be more perfectly formed than the rest, it was, you might say, perfectly round, about an inch in diameter; it appeared to be at least one-half inch deep, that is, a one-half inch depression there." Dr. D. L. Cummins testified substantially that he assisted Dr. Dunn in the autopsy; that he counted the different wounds on the face and head of deceased and there were fifteen scalp wounds. After the scalp was removed he said it was a difficult matter to determine how many skull wounds there were as it was broken up so badly and had run together so badly that it was impossible to tell. This witness says there was one wound on the top of the head, just above the crown where it seemed to be stove down into the brain. He further says some of the wounds of the scalp had been sewed up when he examined it; that it appeared just like a "peck." "They were not what I would call open and gaping wounds, they were like a blunt instrument of some kind had hit her in places." The two witnesses, Dr. Dunn and Dr. Cummins, described the condition of the wounds on the scalp and spoke of different wounds and the appearance of different wounds; but both practically agreed that after the scalp was removed the skull was so broken and crushed it would be almost impossible to tell where the wounds on the outside were.

Dr. Crume, a witness who was called by the appellant, testified that there was a wound on the top of the head, something like an inch in diameter, a kind of a round place where the skull was just knocked out of the head; he said the brain was not affected by this wound; that the brain just lay bare; that a piece of skull was scooped out and

the brain was unbroken. He says there were several places he did not make an examination of to determine the extent of the fractures; that there were several places where there were dents where you could put your finger in and feel it, but that he never made an extensive examination of it; that you could feel in some of those places; that it felt like they were dents, and seemed like they were in the skin. This witness also testified he never saw any wounds on the body of deceased except on her head, only the little place on her finger.

Appellant's first bill of exceptions, omitting the formal parts, complains, substantially, that while Bertie Lee Pounds, a witness for the State, was testifying on direct examination, in the presence and hearing of the jury, the court said to the witness: "Just take plenty of time and answer the questions," and thereafter in the presence and hearing of the jury called said witness from her chair to the bench which he occupied and had a private conversation with the witness, which private conversation was in the presence of the jury as well as the presence and hearing of counsel for appellant, and that the court said to the witness not to be excited or scared as there was no occasion for that, and to take her time and tell things as they occurred. Appellant reserved an exception to this action of the court, because, he says, it constitutes a comment or expression of the court on the credibility of the witness and the weight to be given her testimony. The court allowed the bill with the following qualifications. "That the witness was a girl-child eleven years of age and had just recently recovered from a spell of sickness and was the first witness to be placed on the stand in the case, and the court noted that she was becoming very nervous and agitated, but was not crossing herself in the testimony she was giving, and the court called the child to him and stated to her not to be excited or scared as there was no occasion for that and to take her time and tell things as they occurred. The court stated this to the child not in the hearing of the jury at first, but when the action of the court was objected to by defendant's counsel, then the court stated so the jury could hear him what he had already told the child." We are unable to find from an examination of this bill, even without the qualifications of the trial judge, how it can be distorted into a comment or expression by the court as to the credibility of the witness and the weight to be given her testimony. This child was going through an experience which was new to her and the purpose of the court evidently was to quiet her in order that she might not become excited, and to assure her that no harm would befall her, in order that she might relate the circumstances as they truly occurred. It is the unquestionable duty of the judge to so conduct a trial that the facts may be developed; both the State and the defendant are entitled to that, and neither should desire more nor less. Where the trial judge feels it is necessary for him to take some action similar to that used in this case, he should, of course, not in any way indicate to the jury what his opinion of the credibility of the witness

is, and we cannot discover from the bill of exceptions and the qualifications of the judge with reference thereto how this rule was in any way violated. It seems to have been a commendable act on the part of the trial judge, which, under proper circumstances, could, without criticism or impropriety, have been extended to either a witness for the State or defendant.

Appellant, by his bill of exceptions number two, complains of the action of the trial court in permitting the witness, J. E. Wilfong, to testify as a witness for the State after he had been sworn with the other witnesses and ordered placed under the rule, because the said Wilfong had remained in the courtroom during the time the other witnesses were testifying. This objection was overruled by the court and a bill of exceptions reserved and the court explained the bill in the following language: "That the witness, J. E. Wilfong, is County Attorney of Haskell County, Texas, and assisted the State in the prosecution of the case and sat with the attorneys for the prosecution during a portion of the trial before he was placed on the stand and sat near the attorney representing the defendant, and after the attorney representing the defendant made no objection to the county attorney remaining in the courtroom, although the county attorney was sworn as a witness with the other witnesses at the beginning of the trial of the case." There is no error presented from this action on the part of the court. It is not an abuse of discretion to excuse an attorney from the rule nor to permit one of the State's counsel to testify over the objection that he had been put under the rule; counsel for appellant certainly could not have proceeded with the trial without knowing that the witness Wilfong was remaining in the court-room during the trial, as the explanation of the judge shows that he sat next to the attorney representing the appellant, and no objection was made to him remaining in the court-room. While the county attorney may not have been a necessary officer of the court in this particular case, it does appear that he was assisting in the prosecution, and it would have been an error on the part of the court against the State to have required him to remain out of the courtroom, the same as it would have been an error on the part of the court against the appellant to have placed one of his attorneys who might have been a witness in the case, under the rule. Section 346, page 198, Branch's Anno. Penal Code, and authorities there cited.

Appellant, in his bills of exceptions, numbers three and four, complains of the action of the trial court in permitting the witness W. C. Allen to testify as to finding and taking possession of a hammer in the barn of appellant some twenty-four hours after the injury was inflicted upon deceased, and in describing the condition of the hammer with reference to blood and hair upon it, and as to having taken some hair off the handle and placed it in an envelope, and, also, as to the admission of this hammer in evidence. It has always been permissible to introduce in evidence the implement with which the crime was com-

mitted, together with a description of the same, and the objection urged in this particular instance would not as a matter of law go to the admissibility of the testimony, but rather as to its weight. We apprehend that the contention of counsel for appellant was that the blood and hair on the hammer got there after appellant carried his wife into the barn; and that of the State was that the killing occurred with the hammer; the proof as to the character of the wounds on the head, and as to finding the hammer in the barn, was sufficient to lay the predicate for all this testimony, as well as for the hammer itself to go before the jury. Young v. State, 49 Texas Crim. Rep., 207; Collins v. State, 77 Texas Crim. Rep., 156, 178 S. W. Rep., 345; Sanchez v. State, 67 Texas Crim. Rep., 453, 149 S. W. Rep., 124; Alacon v. State, 90 S. W. Rep., 179; House v. State, 42 Texas Crim. Rep., 125.

In his fifth bill of exceptions appellant complains of the language used by special prosecutor for the State in his opening argument to the jury, as follows: "And by imagination transplant yourselves with the bloody hammer and the whisp of mother's hair, and standing at the lonely grave of this mother write your verdict." Counsel for appellant also requested the court to instruct the jury not to consider this argument, which the court declined to do. Counsel for the State, as well as for the appellant, upon the trial of cases frequently avail themselves of "oratorical license," and it is not every expression by counsel for State which is not a quotation from the testimony that will work a reversal thereof. Before this court would be authorized to reverse a case because of argument of counsel it must be made to appear from the record that it was of such character that injury would result to defendant by reason thereof. While the language used by counsel for the State in this instance may have been a little fervid, yet, we can not say it was of that character which was clearly calculated to prejudice the rights of appellant. In the case of Tweedle v. State, 29 Texas Crim. App., 591, Judge DAVIDSON, in discussing an argument which was complained of as being improper, used this language: "Concede that this argument was improper; it does not follow that the judgment should be reversed for this cause. The remarks must not only be improper, but they must be of such a nature as to be clearly calculated to prejudice the rights of the defendant. To reverse in all cases where counsel fail to confine themselves to the record would render trials farces. There is hardly a case of any importance tried but that during the progress of the trial some unguarded expression is used by counsel upon either side. It would be a remarkable coincidence if this were not true."

By bill of exceptions number six appellant complains of the district attorney's argument, and the refusal of the court to give a charge with reference thereto. It appears from the bill that appellant's counsel had told the jury in his argument that if "defendant had anything against him, don't you know the district attorney would have brought

it out," and in reply to that the district attorney stated in substance "that counsel for appellant, every lawyer in the courthouse, and his honor, knows that until a defendant first puts his character in issue that the State cannot prove a single scintilla or produce any proof as to his bad conduct, and that the argument of appellant's counsel was made to fool some juror with." Appellant excepted and requested the court to give the following charge, which the court refused. "You are instructed that the State had the right to ask the defendant when he was testifying, if he had not previously been charged with or convicted of any criminal offense involving moral turpitude without the necessity of the defendant offering his general reputation in evidence and the remarks of the district attorney that the attorney for defend-ant, in the connection above stated, was trying to mislead the jury is not warranted under the law or the evidence in this case." The indorsement on this charge by the judge is as follows: "Presented to the court and refused by the court because the same calls for additional charge on the law and because the argument of the district attorney was in answer to argument of counsel for defendant." We do not think the argument of the district attorney in the particular mentioned is the subject of just complaint. It seems to have been provoked by argument of appellant's counsel and was in reply thereto. Sinclair v. State, 35 Texas Crim. Rep., 130; Barkman v. State, 41 Texas Crim. Rep., 105, 52 S. W. Rep., 73; Hilcher v. State, 60 Texas Crim. Rep., 180, 131 S. W. Rep., 592; Moore v. State, 48 Texas Crim. Rep., 394. It is true, as stated in the special charge requested, that counsel for the State could have asked appellant on cross-examination if he had within recent years been legally charged with, or convicted of, an offense involving moral turpitude. But these might be, and doubtless are cases, where the general reputation of a witness is bad, and could be so shown, where no legal charges of crimes have ever been made against him.

During the closing argument the district attorney, it seems, took the hammer which was in evidence and said, "I do not know who explained it better than Dr. Cummins himself. On cross-examination he said to the learned counsel: 'No, No, he said, it occurred to me that she had been pecked,—you noticed it—from ear to ear with a blunt instrument, like this." Appellant, as shown by his seventh bill of exceptions, objected to this argument because he claims there was no evidence in the record warranting such argument, and that it was a misquotation of Dr. Cummins' testimony, and requested the court to instruct the jury to disregard said argument, which the court declined to do "because the witness did testify that in his opinion the wounds on deceased's head were inflicted with· a blunt instrument." When we look to the statement of facts it discloses that the witness, Dr. Cummins, testified that on the post mortem examination he first trimmed the hair off the head, and counted fifteen different wounds on her face and head; fifteen wounds in the scalp; that there was a

wound in the top of the head, and side of the head, and front of the head; that a few of the cuts had been sewed up, but some of them just like a peck, like that; they were not open and gaping wounds, they were like a blunt instrument of some kind had just hit her in places. Dr. Dunn had testified that there were fifteen wounds; that they were on both sides of the head, and ranged from one ear to the other across the front above a level with the eye brows, and some of them in the hair. From the description of the wounds generally as shown from the statement of facts, we think the district attorney was within the record, and well within his rights in his argument.

The eighth bill of exceptions shows that the district attorney in his closing argument used the following language: "Has the defendant established to a reasonable and moral certainty that the deceased was killed by the jack?" Appellant objected to same as being an incorrect and wrong statement of the law as given in charge by the court, and requested a special charge as follows: "You are instructed that the law does not require the defendant to establish to a reasonable and moral certainty, as argued by the district attorney, his defense, but the law as given you in the charge, requires the State to assume the burden of proof in establishing the guilt of the defendant as charged, and a reasonable doubt thereof is given the defendant, therefore, you will be governed by the law as given by the court." The judge refused to give the charge "because same calls for additional charge on the law, after argument of the counsel had begun." Of course, the appellant was not called upon to prove beyond a reasonable and moral certainty that the jack kicked and killed deceased, and that statement standing alone was improper argument; but the bill does not disclose the connection in which it was used, and it is not every improper argument that will require the reversal of a case. If the court had given the charge requested it would have been a repetition, and this is not required. He had already told the jury that it "was not sufficient that the circumstances coincide with, account for, and therefore render probable the guilt of the appellant, but must exclude to a moral certainty every other reasonable hypothesis except that of defendant's guilt, and unless they do so beyond a reasonable doubt, you will acquit the defendant," and also that "if they believed deceased was in any manner killed by a jack, or if they had a reasonable doubt thereof, they would acquit." They had also been told that "defendant was presumed to be innocent, and if they had a reasonable doubt of his guilt to find him not guilty." In a special charge requested by appellant the jury were instructed that "the burden of proof rested upon the State to establish the defendant's guilt," and in this connection were again told "if they had a reasonable doubt of his guilt, to acquit him."

In view of these repeated instructions by the court it is not likely, or even probable, that the jury were led away from the law as given them by the judge and we cannot believe such error was committed in the language used as would justify a reversal of the case.

The only other error complained of by the appellant is that the evidence is insufficient to support the verdict and judgment in this case. We will not discuss this question at any great length, but will say that in order to satisfy our own mind with reference to the matter the statement of facts has been read more than once, and studied with this contention of appellant in view. The jury was bound to have known that the pivotal issue in this case was whether the wounds upon the head of deceased were caused by a hammer in the hands of appellant, or whether they were caused by a kick, or kicks, from a jack. It was wholly a question of fact and the jury heard the physicians testify; heard them describe the character of the wounds with such illustrations as the statement of facts show they must have given while on the witness stand, and which cannot be clearly set out in the statement of facts. We do not feel justified in saying that the jury was not authorized in reaching the conclusion that the wounds as described were inflicted by a hammer in the hands of appellant. It is almost inconceivable to our mind that they could have been so inflicted by the kick of a jack; or that if he had kicked deceased as many as three or four times, as claimed by appellant, that the blows could have been placed so accurately by the jack as to strike the deceased in the head and about the same part of the head every time, leaving no marks or bruises about her shoulders or any other part of the body. We are further unable to understand, with the quantity of blood spattered upon the fence and the water trough, how it could occur that if the spatters of blood were caused by a single kick from the jack, or more than one, that some spatters of blood were not found upon the legs or other portions of the jack's body. From a careful examination of the facts as disclosed by the record, and especially the testimony of the Doctors describing the number and character and appearance of the wounds, we would not be justified in disturbing the verdict of the jury.

Finding no reversible error in the record, the judgment of the trial court is affirmed.

*Affirmed.*

ON REHEARING.

May 11, 1921.

MORROW, Presiding Judge.—In the light of appellant's motion for a rehearing, we have reviewed the record, but are still unable to concur in appellant's view that in using the language: "It occurred to me that she had been pecked . . . from ear to ear with a blunt instrument *like this*," the State's counsel transgressed the rule forbidding him in argument to bring before the jury new and damaging facts. There was before the jury evidence that the skull of the

deceased was fractured in a number of places; that by a number of blows with some blunt instrument numerous wounds had been inflicted. Some of these were round and depressed such as obviously would support the inference that they were made with a blunt instrument like a hammer. The hammer which the State's counsel held in his hand at the time the remarks were attributed to him was a part of the case. It was in evidence; it was a blunt instrument. There was a basis for the argument that the wounds were inflicted with it, and in the use of the language counsel, in our judgment, gave no new facts to the jury. His remarks did not purport to do so, considered in the light of the evidence adduced upon the trial. It portrayed, in a graphic manner, the State's interpretation of the evidence, but in its use counsel was within the bounds of legitimate argument.

Upon this and the other matters referred to in the motion for rehearing we have expressed our views in the original opinion. We are constrained to reiterate them. In deference to the earnest and forceful argument of counsel for appellant, we have re-examined them but have thereby been confirmed, in our judgment, that the appellant, upon a fair and legal trial and sufficient evidence, has been adjudged guilty by a jury verdict and that there is nothing before us warranting its overturning.

The motion is overruled.

*Affirmed.*