Willie Melvin STANLEY, Jr., Appellant,

v.

STATE of Texas, Appellee.

No. 04–81–00408–CR.

Court of Appeals of Texas,
San Antonio.
Nov. 30, 1983.

Michael J. Krueger, Kingsville, for appellant.

F.A. Cerda, Dist. Atty., Hebbronville, for appellee.

Before ESQUIVEL, CANTU and REEVES, JJ.

## OPINION

CANTU, Justice.

A jury found appellant guilty of murdering his wife and assessed punishment at confinement in the Texas Department of Corrections for a term of ninety-nine years.

The indictment alleged that on or about October 18, 1979, appellant intentionally and knowingly caused the death of [his wife] by shooting her with a firearm.[1]

On January 28, 1981, and on February 25, 1981, appellant filed motions seeking to quash the indictment based upon the improper constitution of the Duval County Grand Jury. The motion filed on January 28, 1981, alleged that the Duval County Grand Jury Commissioners have systematically excluded persons of Anglo-American descent from grand jury service for over ten years. The February motion alleged that the Duval County Grand Jury Commissioners have, for over ten years, systematically excluded women from grand jury service.

Only the motion filed on February 25, 1981, was urged to the court in a hearing conducted on February 26, 1981, after the hearing on a motion for change of venue. All evidence was tendered to the court by way of stipulations and exhibits. Both motions were overruled by the trial court and its action forms the basis for two of appellant's grounds of error.

Appellant also challenges the sufficiency of the evidence to sustain the conviction and complains of missing portions of the statement of facts. In view of the challenge to the sufficiency of the evidence, a recitation of the facts becomes necessary. Viewed in the light most favorable to the jury verdict, the record reflects the following.

On October 18, 1979, at approximately 10:00 p.m., Duval County Deputy Sheriff Joe Kertesz received a call from his dispatcher informing him that an ambulance was needed at appellant's residence located on a dirt road off Highway 44, approximately two miles outside the city limits of Freer, Texas. Kertesz, the first officer at the scene, arrived at the residence at approximately 10:15 p.m. shortly after the arrival of appellant's parents, Mr. and Mrs. Will Stanley. As Kertesz entered the resi-

dence through the front door, he observed appellant's wife, Marcine Stanley, lying on her back fully clothed on the couch in the living room, with her feet pointed toward the door.

Mrs. Stanley appeared to have two head wounds in addition to a wound on her hand. Her body was cold and rigor mortis had started to set in. A great deal of congealed blood was on the couch and on the floor at the head of the couch. Blood and tissue matter were also evident on the wall behind the couch and beyond the couch into the bathroom and bedroom areas. No signs of forced entry through any of the doors or windows were visible and a search of the perimeter of the house and out buildings for tracks or footprints proved fruitless.

On the afternoon of October 19, 1979, as Texas Ranger Stan Guffey conducted investigative work at the Stanley residence, appellant returned to the residence and gave the officer a list of missing items, which included a .38 caliber handgun and four pieces of jewelry, three of which were later recovered and subjected to laboratory analysis with negative results.

Dr. Joseph Rupp, Nueces County Medical Examiner, testified that he performed an autopsy upon the body of Marcine Stanley on the morning of October 19, 1979. According to Dr. Rupp, the deceased sustained three gunshot wounds from two bullets. The first bullet passed through her left thumb and entered on the left side of the head, penetrating the left side of the brain and coming to rest behind her left ear. The second bullet entered the right side of her forehead leaving a round entrance wound, passed through the brain and lodged in the left side of the neck. Dr. Rupp also observed stripling-like marks on the right side of the forehead indicating a relatively close shot. Both bullets produced fatal wounds.

Dr. Rupp expressed the opinion that the angle of the second shot was markedly different from the first bullet, being in a

1. A previous indictment was dismissed as defective on August 26, 1980 and the instant indictment returned on January 8, 1981.

sharply downward direction and from left to right, while the first shot was a relatively straight shot with no appreciable deviation from left to right or from top to bottom. Dr. Rupp testified that if blood and tissue spatter upward and away from a body a significant distance, then the body was probably lying down when shot. After examining the photographs of the victim, Dr. Rupp reached the conclusion that the deceased had probably been shot while lying down, with her left hand covering her face.

An examination of the content of the victim's abdomen by Dr. Rupp disclosed readily identifiable undigested food, rice and meat. Physiological studies indicate that the stomach usually empties completely within two to four hours after eating. Based on these studies, Dr. Rupp concluded that the victim was shot approximately two hours after she had eaten.

Dr. Rupp recovered two large caliber copper jacketed lead bullets which appeared to be .38 caliber bullets from the victim, who was approximately seven months pregnant at the time of her death. The two bullets were turned over to former Texas Ranger Bobby Pointer who in turn forwarded them to the Texas Department of Public Safety firearms laboratory in Austin. Pointer expressed the opinion that the bullets were .38 or .357 caliber bullets.

Judith Scoggins, a firearms expert employed by the Texas Department of Public Safety, testified that her department was requested to perform a caliber determination upon the two metal jacket bullets received from Pointer. Examination and measurements of the bullets revealed that both bullets had been fired from the same weapon, either a .38 (Special) or .357 (Magnum) caliber firearm. After a comparison of the measurement of the bullets with FBI data, the rifling characteristics of the two bullets were found to be most consistent with being fired from a Smith and Wesson firearm.

Several witnesses testified as to appellant's movements and activities on the day of the homicide. H.V. Reese, appellant's co-worker, testified that appellant lived in a house on the lease where they were working. The house was located approximately 300 feet from the worksite.

On the day in question, according to Reese, appellant went to work at 7:00 a.m., went home for lunch from 11:00 to 12:00 and was at work when Reese returned to the worksite at 1:00 p.m. Reese remembered leaving from work after 2:30 p.m. and that appellant was still at the worksite when he left.

Ramon Pulido testified that on the day in question appellant went to Pulido's feed store looking for Pulido's son, Ruben, to collect money Ruben owed him. According to Pulido, appellant arrived at about 12:00 noon and stayed 15 to 20 minutes, then left and later returned to the store between 3:45 and 4:00 p.m.

Homero Garza testified that he was at Pulido's store when appellant walked in at about 11:45 a.m. Garza testified that appellant left the store 10 or 15 minutes before he did and that he distinctly remembered noticing the clock showing 12:20 p.m. when he left.

John Gilliland and Donna Brooks testified that they drove by appellant's house on their way to Gilliland's trailer after picking up Brooks' daughter at school. Appellant's car was seen parked in front of his house. Both Gilliland and Brooks testified that they arrived at the trailer, a distance of three tenths of a mile, no more than a couple of minutes after driving by appellant's house. Brooks further testified that upon arriving at the trailer she noticed the time to be 3:00 p.m.

Gilliland, who was employed as a deputy sheriff at the time of the trial, testified to measuring distance and travel times between several points in and around Freer driving at reasonable speeds. According to Gilliland it took approximately 1 minute and 35 seconds to get from the point where he saw appellant's car parked in front of appellant's house to his own trailer. Gilliland also measured the distance and travel time between appellant's house to Peck's restaurant in Freer, where appellant was

seen on the day in question. The distance between these two points was two and six tenths miles and the travel time, driving between 15 and 20 miles per hour, was five minutes.

Reverend Malcolm Harrington testified extensively about his movements and whereabouts on the day in question. According to Harrington, he left a meeting at approximately 3:00 p.m. and drove to his residence, 12 or 13 blocks from the downtown area, made several phone calls and returned back into town at about 3:20 or 3:25 p.m. He then went to Peck's Restaurant and had coffee with several other people, staying for about 20 to 25 minutes. When he walked out of the restaurant with Sonny Weaver he saw appellant drive by on Highway 44 from east to west and saw appellant motion to Weaver with a circular motion and Weaver motion negatively in reply. Harrington noted the time to be between 3:25 and 3:40 p.m. Harrington claimed to be very time-conscious on that particular day.

Harriet Lamm, a cousin of the deceased, testified that she had known appellant for about five years. On October 18, 1979, she travelled from her home in George West to the roping arena in Freer and arrived there after 5:00 p.m. Appellant arrived at the arena after 5:30 p.m. with his brother, Ken, and Evaristo Canales, Jr. About 6:00 p.m., appellant's other brother, Gary, arrived at the arena and sought help unloading furniture that he was moving. Lamm, appellant and others went with him to help unload the furniture. The parties returned to the arena at about 6:30 p.m.

Appellant and Lamm left the arena at about 8:00 p.m. and went to the Dairy Queen in Freer in separate vehicles. From there they both proceeded to a point about 10 miles out of town on Highway 59 toward George West and parked at a roadside park for a period of some twenty to thirty minutes where they conversed and kissed. Lamm testified about an on going romance between her and appellant which included numerous phone calls and at least one rendezvous. She admitted to having engaged in sexual intercourse with appellant on at least two occasions prior to October 18, 1979.

Appellant testified in his own behalf and denied committing the murder. According to appellant he had been working on the R.E. Smith lease and living on the lease for about thirteen months prior to his wife's death. He testified that on October 18, 1979, he went to work at 7:00 a.m., gauged some wells and then went into town to leave a flat tire to be fixed. He further related that he went home for lunch between 11:00 and 11:30 a.m., but that when he got home he decided to go into town to get some ice. According to appellant, he stopped at Pulido's store looking for Pulido's son and then stopped at a convenience store to get some ice. He returned to his house between 12:15 and 12:30. By that time his wife had prepared lunch for them and they ate around 12:45. He left the house to return to work around 1:00 p.m. Appellant further testified that his supervisor, Reese, left for home at 2:30 p.m. at which time he put the company truck in the garage, walked home, changed clothes and offered to take his daughter to his mother's house because his wife was feeling ill. According to appellant he left his house at 2:45 p.m. and drove the dirt road to Highway 44 where he turned left and drove straight into town without stopping anywhere, driving in front of Peck's Cafe where he recalled seeing Sonny Weaver and motioned to him that they were going to rope that night. Appellant remembered looking at his watch when he left the house and noticing the time to be 2:45 p.m. Appellant claimed that it took him between 10 to 15 minutes to go into town and that he passed in front of Peck's Cafe at 3:00 p.m.

Appellant further testified that after passing Peck's Cafe and motioning to Weaver, he went to his parent's house some three or four blocks past Peck's, found no one home, then went to the rodeo arena where he stayed for about 10 or 15 minutes so that his daughter could look at the animals. He then returned to Pulido's store, stayed there between 15 and 20 minutes,

then went to a convenience store and purchased a six pack of beer and returned to his mother's house around 4:30 to 4:45 p.m. His mother arrived a little after 5:00 p.m. and appellant asked her to take care of his daughter. Appellant returned to the roping arena around 5:20 p.m. and then went to help his brother unload furniture, returning later to the arena where he remained until 8:30 p.m.

Appellant admitted meeting Lamm at the Dairy Queen in Freer and later driving out of town where he rendezvoused with Lamm. He claimed the meeting lasted a brief 5 or 10 minutes and that he then returned to his parent's home to pick up his daughter. Appellant claimed that he left his parent's house and headed home between 9:30 and 9:45. When he arrived he found the front door locked and proceeded to enter the house through the kitchen using the rear door. When he discovered his wife's body lying on the couch he called his parents and deputy Gonzales. Appellant also testified that he owned a Smith & Wesson .38 caliber pistol which was usually kept in a drawer in the nightstand and which he reported missing. Much of appellant's testimony conflicted with that of Lamm but appellant did not deny involvement in a romantic affair.

Appellant's parents were called as defense witnesses. Mrs. Rita Stanley, appellant's mother, testified that she was out of town on October 18, 1979, but returned home about 5:15 p.m. where she found appellant and his daughter. Mrs. Stanley agreed to care for the child while appellant assisted his brother to unload furniture. According to both of appellant's parents, appellant returned to their house between 9:00 and 9:30 p.m., remained for about 15 to 20 minutes and then left with his daughter. At a few minutes past 10:00 p.m. appellant called his mother and told her to come to his house. When Mr. and Mrs. Stanley arrived at appellant's house they saw the victim lying on the couch essentially as described by other witnesses. According to Mrs. Stanley, one of the investigating deputies asked appellant where he kept his firearms. Appellant at first answered that he

did not know. However, when pressed by the deputy, he answered that a rifle was in a closet and a pistol in the nightstand.

Appellant also called a witness, W.W. Manley, to testify that he owned a trailer house in the general vicinity of his house and that he had been burglarized twice prior to the murder. According to Manley, a conversation about the burglaries with the victim a few days prior to her death convinced him that she knew something about them and was in fear.

The State called three rebuttal witnesses. Two of them reinforced the existence of a romantic affair between appellant and Lamm. The third witness, Texas Ranger George Powell, testified as to the contents of a conversation between appellant and him on October 22, 1979, concerning the subject of appellant seeing a psychiatrist. According to Powell, appellant was not under arrest at the time and was no longer being interrogated when he volunteered the subject of seeing a psychiatrist. Powell testified that appellant had asked him if he thought that he (appellant) should go see a psychiatrist, and if he thought it possible that he (appellant) could have blacked out, killed his wife and not remembered.

Appellant offered no corroborative testimony regarding his whereabouts from the time he first waved to Weaver in front of Peck's Cafe, which by his own testimony occurred at 3:00 p.m., and the time he saw his brother and Canales at his parent's house at 3:45 p.m. On the other hand, the State's evidence places appellant at his work site sometime after 2:30 p.m. but before 2:45 p.m. and in front of his house one minute before 3:00 p.m. It later places him at Pulido's store between 3:45 and 4:00 p.m. Harrington's testimony places appellant in front of Peck's Cafe between 3:35 and 3:40 p.m.

If appellant's testimony, that he was in front of Peck's Cafe at 3:00 p.m., is correct, then Gilliland's measurements as to time and distance would place appellant at his house at 2:55 p.m. as opposed to appellant's claim that he left at 2:45 p.m. and that it

took him from 10 to 15 minutes to travel the distance of two and six tenths miles.

■ Appellant contends that his conviction rests upon circumstantial evidence amounting to only a "strong suspicion" and "mere probability" that he committed the offense. A circumstantial charge was given the jury and the test on appeal is "whether there was sufficient evidence from which the juror's (advised of the restrictions that the law places upon them in condemning one on circumstantial evidence) might reasonably conclude that every reasonable hypothesis other than guilt was excluded." *Nathan v. State,* 611 S.W.2d 69, 75 (Tex.Cr.App.1981); *Wilson v. State,* 654 S.W.2d 465, 467 (Tex.Cr.App.1983).

■ It is not necessary that every fact point directly and independently to appellant's guilt. It is enough if the conclusion is warranted by the "combined and cumulative force" of all the incriminating circumstances, *Flores v. State,* 551 S.W.2d 364, 367 (Tex.Cr.App.1977), so long as any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

■ The rules of circumstantial evidence do not require exclusion to a moral certainty of every hypothesis that the act may have been committed by another person. The hypothesis intended must be a reasonable one consistent with the circumstances and facts proved and the supposition that the act may have been committed by another person must not be out of harmony with the evidence. *Flores v. State, supra* at 367. Necessarily each case must be tested on its own facts. *Moore v. State,* 532 S.W.2d 333, 337 (Tex.Cr.App.1976).

■ In the instant case, appellant denied the killing and attempted to account for his whereabouts during the day in question. Through his testimony and, that of defense witnesses, appellant sought to establish an alibi for the critical period between 2:45 p.m. and 3:00 p.m. The State's evidence refuted appellant's efforts to account for his presence during the critical periods already mentioned. The jury is the exclusive judge of the evidence adduced, the credibility of the witnesses and the weight to be given their testimony. *Easley v. State,* 478 S.W.2d 539, 540 (Tex.Cr.App. 1972). The jury was, therefore, free to accept the State's version of appellant's whereabouts during the period deemed critical, and to reject appellant's version. *Wright v. State,* 437 S.W.2d 566, 568 (Tex. Cr.App.1969).

■ We think the combined and cumulative force of all the incriminating circumstances justifies the jury finding of guilt and that the evidence does exclude all other reasonable hypotheses except appellant's guilt. Appellant's challenge to the sufficiency of the evidence to support his conviction is overruled.

■ Appellant next complains of trial court error in denying his motion for change of venue. The motion for change of venue alleged that bias, prejudice and other influential forces existed against him such that he could not receive a fair trial in Duval County.

The State filed its controverting affidavit and a hearing was held on the motion on February 25, 1981. At the termination of the hearing, the trial court denied appellant's motion. The defense presented the testimony of five witnesses, all residents of Duval County, two of whom travelled extensively within Duval County. The essence of their testimony was that appellant could not obtain a fair and impartial trial in Duval County because between seventy-five and ninety percent of the people with whom the witnesses had discussed the case had already prejudged appellant's guilt. The witnesses testified about the newspaper and radio publicity which the case had received. In addition, the testimony disclosed that the father of the victim was a powerful individual in Duval County and that this fact would have a bearing on whether or not appellant could obtain a fair trial in Duval County. During cross-examination, the witnesses admitted that the newspaper and radio publicity which formed the basis of

their opinions consisted of little more than factual reporting of the killing and the subsequent indictment and arrest of appellant. All agreed that none of the media reports contained evidentiary information. In addition, the hearing regarding the media publicity relied upon by appellant occurred sixteen months after the commission of the murder.[2] No attempt was made by appellant to introduce documentary evidence disclosing the degree of publicity attributed to media releases. This court is, therefore, relegated to testimonial evidence consisting primarily of vague recollections of the five witnesses. An examination of the witnesses' testimony convinces us that the media publicity consisted of nothing more than a fair, non-inflammatory account published for the purpose of informing the public of current events. Cf. *Freeman v. State*, 556 S.W.2d 287, 297 (Tex.Cr.App.1977); *Adami v. State*, 524 S.W.2d 693, 701 (Tex.Cr.App. 1975).

At the hearing it was shown that the population of Duval County, according to the 1970 census, was 11,722 and that the county consisted of four principal towns: San Diego (the county seat), Freer, Benavides and Realitos, with a number of smaller communities scattered throughout the county. Four of the five defense witnesses were residents of Freer and three of these four admitted that their opinions were based predominantly upon contact with other residents of Freer where the murder occurred. Most of the discussion of the case between the witnesses and other people appears to have occurred at or about the time of the killing with a progressive decrease in discussion with the passage of time.

Although the defense witnesses made general references to "publicity," "talk," "prejudice" and "politics," not one could offer specifics tending to show that it was unlikely that appellant would receive a fair trial in Duval County.

Only one witness characterized the victim's father as a "powerful man" in Duval County, a fact which would in his opinion have a bearing on whether or not appellant could obtain a fair trial in Duval County. This same witness could not, however, offer any basis for the statement. This testimony falls far short of disclosing a dangerous combination against him, instigated by influential persons, by reason of which he cannot expect a fair trial. See TEX.CODE CRIM.PROC.ANN. art. 31.03(a)(2) (Vernon Supp.1982–83).

Because of due process requirements that an accused receive a trial by an impartial jury free from outside influences, *Adami v. State, supra,* at 703, we find it appropriate to examine the *voir dire* of the prospective jurors to effectively determine whether appellant was tried by an "impartial jury free from outside influences." *Freeman v. State, supra* at 296.

A review of the record of the *voir dire* examination reflects that of the prospective jurors drawn and ordered summoned, 83 of them were actually examined before the jury was completed. Of the 83 venire persons, 34 were from San Diego, 26 from Freer, 21 from Benavides and 2 from Realitos. Of these 83 potential jurors, 5 were excused for medical or personal reasons or by agreement of the attorneys and 8 were excused on challenges for cause by the State or the defendant because of objections to the law on circumstantial evidence, the range of punishment, or for other reasons unrelated to the case. One juror was excused because he was related to a witness. Only 10 jurors were excused because of bias or for having formed an opinion on the case. Eight of the 10 excused jurors were from Freer. Only one of the 10 jurors excused stated what his opinion was, and that juror expressed the opinion that appellant was not guilty.

Of the 59 remaining jurors, 28 were from San Diego, 16 from Freer, 13 from Benavides and 2 from Realitos. Of these 59 remaining jurors, 24 testified that they had heard or read about the case. Seven of the 24 testified that they read or heard about the case back when it happened and there was no showing when the rest of the ve-

2. The motion for change of venue was heard

fifteen months prior to selection of this jury.

niremen heard or read about the case. At least 3 of the 24 testified they paid little attention or did not remember what they had read. No inquiry was made into the extent of the other juror's knowledge of the case. Of the 12 jurors ultimately selected to hear the case, 6 were from San Diego, 4 from Benavides and 2 from Freer.

Only 2 jurors testified that they heard alot about the case or had discussed it with others. Both of these jurors were from Freer and were among the 10 jurors excused for bias or opinion, one of them on a challenge by the State. Of the 24 who heard or read about the case, only one potential juror admitted to forming an opinion on the basis of what was heard. This same potential juror admitted that the opinion was not a fixed opinion. None of the 23 remaining potential jurors who heard or read about the case ever discussed the case with anyone else. None of them had formed an opinion as to guilt or innocence of the appellant from what they had read or heard. Each agreed to be bound strictly by the evidence presented at the trial. None of these potential jurors were challenged for cause by appellant.

The State countered solely with the testimony of the District Clerk who testified that, based upon his twenty-two years experience as district Clerk and the fact that juries had been selected in at least five or six murder cases, it was his opinion that appellant could receive a fair trial in Duval County. The opinion was offered despite the fact that he could not recall a hearing ever having been held and despite the fact that he had not discussed the case with anyone.

■ Appellant contends that the State's failure to present any testimony other than the testimony of the District Clerk failed to rebut the evidence raised by appellant's witnesses. We are not persuaded that the State's failure to call additional witnesses necessarily established beyond dispute that appellant would not be likely to obtain a fair and impartial trial before a Duval County Jury.

■ Effective cross-examination can in most cases, as it did in this case, undermine the defensive presentation so as to call into play the trial court's discretionary powers under the provisions of TEX.CODE CRIM. PROC.ANN. arts. 31.03 (Vernon Supp.1982–83) and 31.04 (Vernon 1979). *Ward v. State,* 427 S.W.2d 876, 881 (Tex.Cr.App. 1968); *See also Adami v. State, supra* at 703, (where the State did not call a single witness but relied entirely upon vigorous cross-examination of appellant's witnesses.)

We find it significant that most of the publicity and talk of the instant case occurred at the time or shortly after the offense occurred and decreased thereafter. Of equal significance is the fact that the hearing was held sixteen months after the killing and some fifteen months before the trial. Thus almost all of the publicity and discussion shown to have occurred during the hearing transpired between 30 and 31 months prior to trial. *Cf. Adami v. State, supra* at 704; *Clifford v. State,* 424 S.W.2d 233, 236 (Tex.Cr.App.1968).

■ A review of all the foregoing factors convinces us that the trial court did not abuse its discretion in overruling appellant's motion for a change of venue and in conducting the trial in Duval County.

■ Appellant's third ground of error complains of the trial court's refusal to quash the indictment because the grand jury allegedly was not comprised of a representative cross-section of Duval County, Texas. In his First Amended Motion to Quash the indictment, appellant alleged that the grand jury which handed down the indictment was comprised of twelve men and as such its composition was not representative of a cross-section of Duval County, Texas, inasmuch as fifty-one percent of Duval County was female. A hearing was held on stipulated evidence which consisted of grand jury lists for the preceding fourteen year period of time prior to the appellant's trial. Defense exhibit one, the grand jury lists, indicates that ninety-one percent of the grand jurors chosen over that span of time were males and only nine percent females. The 1970 census for Duval County

indicates that of the 11,722 residents in the county, fifty-one percent were females.

The State's evidence, also stipulated to, discloses that over the four year period of time, immediately prior to appellant's indictment, women had participated as grand jury commissioners. Also included in the State's evidence were instructions given to the jury commissioners to be used in selecting grand jury members.

For the four year period from February 1977 through February 1981, the State's evidence reflects that women comprised 33 percent of the grand jury commissioners, ranging from a low of 20 percent to a high of 60 percent. Women also comprised 25 percent of the grand jury panels, ranging from 15 percent to 45 percent, and they comprised 27 percent of the grand jurors selected, ranging from 7 percent to 58 percent for individual terms. The State's evidence also indicates that the grand jury which returned the first indictment, against appellant, which was subsequently dismissed as defective, had among its composition 5 women. The grand jury panel from which that grand jury was selected was composed of 45 percent women.

The August 1980 term grand jury which returned the second indictment forming the basis of the instant conviction contained no women in its makeup, however, 3 of the 5 jury commissioners who selected the grand jury panel out of which the grand jury that returned the indictment was selected were women.

Appellant argues that this court should read the holding in *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975) in conjunction with the Court's holding in *Castaneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977).

*Taylor v. Louisiana, supra,* dispelled once and for all the belief that a defendant had no standing to object to the exclusion of members of the opposite sex from his jury even though he was not a member of the excluded class. *Castaneda v. Partida, supra,* involved the establishment of a *prima facie* case of systematic exclusion of Mexican-Americans from grand jury duty during an eleven year period and the failure of the State to rebut the *prima facie* case thus presented.

Appellant asserts that he made out a *prima facie* case of systematic exclusion of women on grand juries in Duval County and further alleges that the State failed to rebut his *prima facie* case. *Castaneda* speaks in terms of a showing of substantial underrepresentation of an accused's group. Appellant would have us ignore evidence of female participation in the grand jury process during the four years preceding the return of appellant's indictment. We decline to do so for various reasons. As noted ante, appellant's earlier indictment was returned by a grand jury which included five women. We do not find it significant that the second grand jury contained no women in its makeup since such would not necessarily be indicative of invidious discrimination or substantial underrepresentation. To the contrary, we think that the contrasting compositions reflect the arbitrariness of the selection process. The instant case is not like *Castaneda* where the State inexplicably remained silent and the defendant's evidence required acceptance at face value.

While the evidence favorable to the appellant supports invidious discrimination against females or at the very least substantial underrepresentation for the first ten years of the fourteen year period covered by appellant's tender of proof, we find it significant that the remaining four years of the total period involved are not in keeping with the earlier grand jury selection process. The State, in its brief, appears willing to concede the existence of past wrongs but urges us to focus on the history of grand jury composition for the last four years immediately preceding appellant's indicting grand jury. We think the State's position is a sound one.

In *Espinoza v. State,* 604 S.W.2d 908 (Tex.Cr.App.1980), our Court of Criminal Appeals recognized that past constitutional error should not serve as the basis for the dismissal of an indictment where the evidence does not show that the sins of the past continue to permeate the indictment

process. *Id.* at 910. We hold that the record does not support a finding of invidious discrimination or the systematic exclusion causing a substantial underrepresentation of women in the grand jury process in Duval County.

We find that the grand jury that indicted appellant contained no women on its composition. However, after examining records of recent earlier grand juries, we are not able to conclude that the absence of women in appellant's indicting grand jury was caused by purposeful discrimination. Appellant's third ground of error is overruled.

■■■ In his final ground of error appellant contends reversible error exists because of the court reporter's failure to include in the appellate record a transcription of his notes covering the final jury arguments. Error is predicated upon a failure to comply with a timely request in the form of a pretrial motion seeking to have the portions allegedly absent transcribed and included in the record. The record indicates that the motion was granted by the trial court prior to trial.

No allegation is made that the jury arguments were not taken by the court reporter, but rather the complaint is that they are not included in the appellate record. Nor is there any allegation that the allegedly missing portion of the record reflects any trial error.

The records of this Court indicate that the transcript and statement of facts as originally prepared were received and filed with the clerk of this Court on December 16, 1981, without evidence of the trial court's approval. A supplemental transcript containing the trial court's approval of the statement of facts was filed with this Court on April 12, 1982. Appellant received notice of the trial court's approval of the record on May 10, 1982. Not until June 9, 1982, when appellant filed his motion to allow the filing of a supplemental statement of facts, did appellant ever complain of the omission of the part of the record now claimed to constitute error.

The missing portion of the statement of facts is now before this court designated as Volume 0 and although we have been directed to no portion of that volume as containing reversible error, we have nonetheless examined it for fundamental error. We have found none. We hold that no error was committed because a portion of the statement of facts was originally not included in the appellate record and that no harm resulted from the filing of that portion of the record at a subsequent time. This is particularly true in the absence of some claim of error in the missing portion.

The judgment of the trial court is affirmed.