Andy Joe HOLMES, Appellant,

v.

The STATE of Texas, Appellee.

Nos. 10–01–00273–CR, 10–01–00274–CR.

Court of Appeals of Texas,
Waco.

March 24, 2004.

Walter M. Reaves, Jr., West, for appellant.

John W. Segrest, McLennan County Dist. Atty., Waco, appellee.

Before Chief Justice GRAY, Justice VANCE, and Justice REYNA.*

## OPINION

TOM GRAY, Chief Justice.

Andy Joe Holmes pled guilty to two charges of Aggravated Assault. His victims were his former wife and her adult son. Holmes asked the jury to assess his punishment. After a trial on punishment, Holmes was sentenced to 35 years in prison on both charges. He presents two issues on appeal. We affirm.

## BACKGROUND

Holmes attacked his former wife, Toni Hawkins, the morning after she obtained a divorce from him. He attacked her with a knife. Her screams awakened her son, Leroy Hughes. Hughes saw his mother scuffling with Holmes and went to assist her. Holmes ultimately stabbed Hawkins and Hughes multiple times. One of Hughes's wounds was a severed main artery in his left arm.

## EXPERT TESTIMONY

Holmes's first two issues deal with expert testimony admitted under rule 702. TEX.R. EVID. 702. The leading case in this State, for criminal cases, remains *Kelly*. *Kelly v. State*, 824 S.W.2d 568 (Tex.Crim. App.1992). *Kelly* lays out a "common sense" test based upon an analysis of three criteria to determine if expert testimony is reliable. *Kelly* stated:

> As a matter of common sense, *evidence derived from a scientific theory*, to be considered reliable, must satisfy three criteria in any particular case: (a) the underlying scientific theory must be valid; (b) the technique applying the theory must be valid; and (c) the technique must have been properly applied on the occasion in question.

*Id.* at 573 (emphasis added). The case then discusses seven factors that could affect a trial court's reliability determination. The Court emphasized the list was not exclusive. *Id.* The factors are identi-

---

* This case was submitted with former Chief Justice Davis on the panel, but he resigned effective August 4, 2003. *See* TEX.R.APP. P. 41.1(c). Justice Reyna, who took the oath of office on January 5, 2004, participated in the decision of the court.

fied as follows: (1) the extent to which the underlying scientific theory and technique are accepted as valid by the relevant scientific community, if such a community can be ascertained; (2) the qualifications of the expert(s) testifying; (3) the existence of literature supporting or rejecting the underlying scientific theory and technique; (4) the potential rate of error of the technique; (5) the availability of other experts to test and evaluate the technique; (6) the clarity with which the underlying scientific theory and technique can be explained to the court; and (7) the experience and skill of the person(s) who applied the technique on the occasion in question. *Id.*

There is no precise correlation between the factors and criteria. We note that the factors generally correlate with the criteria as follows:

factor 1 relates to criteria (a) and (b);

factor 2 relates to qualification;

factor 3 relates to criteria (a) and (b);

factors 4 and 5 relate to criteria (b);

factor 6 relates to criteria (a) and (b); and

factor 7 relates to criteria (c) and qualification.

Qualification, as such, is a separate issue under rule 702 and is not a criteria in the reliability test except to the extent it is a factor to weigh in assessing the evidence on the three identified criteria.

At this point, we must briefly digress to make one point clear. When an analysis is being made under rule 702, there is an inherent problem in establishing the validity of the particular theory. To establish the validity of the theory, you need an expert to testify. But they cannot be an

expert if the theory has not been recognized as a valid scientific theory. You see the point and the problem. You do not have a valid theory until you have an expert who can validate it. You do not have an expert until you have a valid theory. We need not tarry on this chicken-and-egg problem for long. We use our common sense and recognize that the witness validates the theory in which the witness is simultaneously validating their own qualifications as an expert.

### BLOOD SPATTER ANALYSIS[1]

Holmes's brief presents us with our first obstacle in reviewing his issues adequately. In the section entitled "Issues Presented," Holmes sets out three issues. The first two are as follows:

1. Did the trial court err in allowing expert testimony from a witness on blood splatter analysis, whose only qualification was that he had attended a 40 hour school on blood splatter analysis.

2. Did the court err in holding the state established that blood splatter analysis was reliable, where there was no testimony concerning the validity of the scientific techniques involved, or whether or how they had been verified.

These issues appear fairly straightforward. The first issue is a complaint about the expert's qualifications. The second appears to be an attack based only on the second criteria used to determine reliability of expert testimony, that is, the technique applying the theory must be valid. *See Kelly v. State,* 824 S.W.2d 568, 573 (Tex.Crim.App.1992). However, six pages

---

1. Courts and parties have referred to this as either "blood spatter" or "blood splatter" analysis. We have chosen to refer to it as "blood spatter" analysis based upon the more comprehensive definition of "spatter" con-

tained in the American Heritage College Dictionary, 3rd Edition. Thus, regardless of which term a particular case may have used, for consistency we will refer to it as blood spatter analysis.

later, Holmes alters and combines the first two issues into "Point of Error Number One" which states:

THE TRIAL COURT ERRED IN ALLOWING A POLICE OFFICER TO TESTIFY AS A BLOOD SPLATTER EXPERT WHERE THERE WAS LITTLE TESTIMONY CONCERNING HIS QUALIFICATIONS, AND THERE WAS NO TESTIMONY CONCERNING THE RELIABILITY OF BLOOD SPLATTER INTERPRETATION.

At this point, it appears Holmes is attacking the qualifications of the expert and launches a global attack on the reliability of blood spatter analysis, thus invoking a review of all three criteria of *Kelly,* the third one being that the technique must have been properly applied on the occasion in question. *See Kelly v. State,* 824 S.W.2d 568, 573 (Tex.Crim.App.1992). But in the body of his argument, Holmes argues that (1) because Steve January was not qualified as an expert, the State did not establish the scientific validity of blood spatter analysis, thus raising a complaint of only the first criteria of *Kelly;* (2) January was not qualified as an expert in blood spatter analysis, qualification being a separate issue under a rule 702 analysis; and (3) Holmes was harmed by January's testimony.

Holmes provides no specific argument or analysis as to whether the technique was properly applied on the occasion in question. He simply argues validity and qualifications. This does not get him a review of the application criteria. A party can have the world's foremost authority testify and establish the validity of the scientific field, but if the technique is improperly applied, the testimony is not reliable. It is not a question of the witness's qualification as an expert, although that can be a factor in the analysis; it is a question of the expert's application of the underlying sci-

ence on the occasion in question. Thus, based on Holmes's brief, we will address whether the testifying expert was qualified, whether the theory/field of blood spatter analysis is valid (the first *Kelly* criteria), whether the technique applying the theory is valid (scope within field—the second *Kelly* criteria), and, if necessary, whether Holmes was harmed by the admitted testimony.

QUALIFICATION

■ To qualify as an expert witness, the witness must possess special knowledge of the specific matter about which the expertise is sought. *Cortijo v. State,* 739 S.W.2d 486, 488 (Tex.App.-Corpus Christi 1987, pet. ref'd). The special knowledge that qualifies a witness to give an expert opinion may be derived from specialized education, practical experience, a study of technical works, or a varying combination of these things. *Wyatt v. State,* 23 S.W.3d 18, 27 (Tex.Crim.App.2000)(quoting *Penry v. State,* 903 S.W.2d 715, 762 (Tex.Crim. App.1995)); *see* TEX.R. EVID. 702. An expert witness's knowledge or experience about an issue must only exceed that of an average juror. *Gonzales v. State,* 4 S.W.3d 406, 417 (Tex.App.-Waco 1999, no pet.).

■ Whether a witness presented qualifies as an expert is a question that rests largely in the trial court's discretion. *Wyatt,* 23 S.W.3d at 27; *Gonzales,* 4 S.W.3d at 417. Absent a clear abuse of discretion, the trial court's decision to admit or exclude the testimony will not be disturbed. *Wyatt,* 23 S.W.3d at 27; *Cortijo,* 739 S.W.2d at 488.

The Court of Criminal Appeals has previously found no abuse of discretion in qualifying a witness as an expert in blood spatter analysis where the witness had received more than 60 hours of training, had read a book on the subject, and contended that the methods used were of the

type relied on by experts in the field. *Alvarado v. State*, 912 S.W.2d 199, 215–216 (Tex.Crim.App.1995).

### Evidence

Regarding his qualifications, January testified that he had been employed with the Waco Police Department for 13 years. His current assignment was as a detective for the special crimes unit. January stated he had been a detective in that unit for six and a half years. As a detective for the special crimes unit, January was responsible for conducting follow-up investigations on major crimes that occur against persons.

January also testified that he had received Level 1 training in blood spatter analysis. He explained that there are two levels of training and that Level 1 training included the recognition of blood patterns and blood spatter that is caused by some type of blood source at the scene. The Level 1 training session was one-week long and taught at the DPS academy in Austin. January estimated that he actually participated in 45–50 hours of instruction. The instructor, Bob Henderson, was a nationally known blood spatter expert. Henderson studied under Tom Bevel, another world renowned blood spatter expert.

In the class, January studied blood velocities, blood patterns, blood sources, and weapons. January explained that the size of the blood drop, the blood stain, or the blood pattern is determined by several different variables such as what struck the blood source. He further explained that a projectile from a weapon would cause a fine mist of blood to hit whatever surface it strikes. He stated that a medium velocity weapon would be something like a club and a low velocity weapon would be something like a fist.

January also studied the results of when weapons touch a blood source and then create a "cast-off" pattern. He explained that a cast-off pattern is created when an object, like a knife, contacts a blood source and, when removed from the blood source, distributes the blood that was on it to another surface such as a wall. This creates a different pattern than if someone was standing and dripping blood on a surface.

January stated that in the class, he applied the principles taught by participating in demonstrations of blood spatter in rooms covered in butcher paper. Using different types of weapons which included guns, knives, and clubs, January and his classmates hit different types of objects that were soaked with blood so they could study the different patterns. He testified that he based his interpretations on the case studies and experience from the school and on crime scenes.

In response to a question by the trial court, January testified that he has had the opportunity to use the techniques and apply the analysis he learned at the school in his investigations of crime scenes. January also told the court that he would use the principles he learned while looking at photographs and testifying before the jury about how blood could be transferred to an item or object. January explained for the court the significance of the shape of blood drops in a photograph of the crime scene presented by the State.

January testified that, in addition to hands on experience, he read books on blood spatter analysis that were written by other experts using the same theories. It was his understanding that the application of blood spatter analysis had been verified by other experts in the field.

### Conclusion

We discern no difference between the experts's qualifications on blood spatter analysis in *Alvarado* and January's qualifi-

cations. Thus, the trial court did not abuse its discretion in finding January qualified to testify as an expert. Holmes's issue regarding January's qualification as an expert is overruled.

RELIABILITY

Again, we reach a stumbling block on Holmes' second presented issue; that being, preservation. On five occasions, Holmes objected to or discussed January's *qualifications* to testify as an expert in blood spatter analysis. As January began to explain blood spatters in a photograph, Holmes's attorney objected. The objections and statements counsel made were as follows:

> Objection, Your Honor. Until it is shown that Detective January has technical and scientific training and knowledge to testify to an opinion—
>
> \*    \*    \*    \*    \*    \*
>
> Daubert–Robinson and the Code of Criminal Procedure concerning testimony of expert witnesses—. . . one, Your Honor, and further request a Daubert–Robinson hearing concerning qualifications on Detective January as an expert.

The trial court agreed to hold a hearing outside the presence of the jury. Prior to the start of testimony for the hearing, counsel stated:

> Actually, if I'm being asked to talk about his qualifications, I think the burden is on the State to show that the man is qualified to testified (sic) as opposed to me.
>
> \*    \*    \*
>
> . . . as I understand, the State has the burden of showing the witness is qualified to testify as an expert, and so I'm asking the State to present testimony.

Then, at the conclusion of the hearing, counsel argued:

> Again, Your Honor, I renew my objection. Obviously as to the testimony of that one photograph that we were talking about, I'd like to have that testimony in, but I don't know what other photographs are going to be discussed and what the testimony is going to be there, and I do not believe that Detective January has been shown to be qualified under Rule 702 by knowledge, skill, experience, training or education to testify as to the causation of how blood was transferred from one source to another, and we would move to strike—or move to limit his testimony to that of personal observation as opposed to opinion testimony of the expert.

The objection was overruled. The hearing outside the presence of the jury was predicated solely on Holmes's complaint that January was not qualified as an expert regarding blood spatter analysis. It is clear from the passages in the record that Holmes was not challenging the reliability of the theory of blood spatter analysis.

It was not until after the hearing and for the purpose of stating an objection on the record before the jury that Holmes, for the first time, suggested a complaint about the reliability of the field of blood spatter analysis. His objection is as follows:

> Your Honor, if we are still at the photograph which I believe was State's exhibit 8, prior to Detective January testifying as to blood spatter analysis, I would again *renew my objection* under Rule 702 of the Rules of Evidence to the qualifications of Detective January as an expert in the area of blood spatter analysis in that there is no showing of the validity of the science of blood splatter, there has been no showing of the validity of the technique of blood splatter employed, and there has been no showing of technique being properly applied on the occasion in question prior to us

coming on the record in front of the jury, and I'm referring to the hearing outside the presence, Your Honor. (emphasis added).

Because the objection regarding the reliability of the field was obscured by the repetition of five challenges to January's qualifications, one of which resulted in a hearing outside the presence of the jury, and because the purported purpose of the "sixth" objection was to simply get that objection on the record before the jury, it is not clear that anyone understood that this was not the same objection simply being restated in front of the jury and went to an entirely different complaint about the testimony January was about to give.

■ Objections promote the prevention and correction of errors. *Aldrich v. State,* 104 S.W.3d 890, 894 (Tex.Crim.App.2003). And we should require very specific objections to attack the basis of expert testimony. *See* TEX.R. EVID. 702. The objection should be sufficient to inform the trial court and the proponent of the evidence of the alleged defect in the foundation for the admission of expert testimony. But a sufficient objection to expert testimony should not be buried or obscured by numerous objections to other defects. *Compare* TEX.R. CIV. P. 274. "Shotgun" objections, which cite many grounds for the objection without argument and serve only to obscure the specific grounds of the objection, do not preserve a complaint for appellate review. *Webb v. State,* 899 S.W.2d 814, 818 (Tex.App.-Waco 1995, pet. ref'd); *Berry v. State,* 813 S.W.2d 636, 639 (Tex.App.-Houston [14th Dist.] 1991, pet. ref'd). If Holmes's intent was to challenge the reliability of blood spatter analysis and put the State to the task of proving each of the three *Kelly* criteria, his intent was obscured by the continuous objections to January's qualifications. He should not

benefit from the obscurity. Although we have grave doubts that this complaint is properly preserved for review, we will, nevertheless, address the issue.

### Law

■ To be considered reliable, evidence derived from a scientific theory must satisfy three criteria: (1) the underlying scientific theory must be valid; (2) the technique applying the theory must be valid; and (3) the technique must have been properly applied on the occasion in question. *Kelly v. State,* 824 S.W.2d 568, 573 (Tex.Crim.App.1992). This three-criteria test is not limited to novel scientific evidence; it applies to all scientific evidence. *Hartman v. State,* 946 S.W.2d 60, 63 (Tex.Crim.App.1997). The proponent of the scientific evidence has the burden to prove its reliability by clear and convincing evidence. *Kelly,* 824 S.W.2d at 573.

■ But a party seeking to introduce evidence of a scientific principle need not always present expert testimony, treatises, or other scientific material to satisfy the first two criteria of the *Kelly* test. *Hernandez v. State,* 116 S.W.3d 26, 28–29 (Tex.Crim.App.2003). It is only at the dawn of judicial consideration of a particular type of forensic scientific evidence that trial courts must conduct full-blown "gatekeeping" hearings under *Kelly. Id.* at 29. Trial courts are not required to re-invent the scientific wheel in every trial. *Id.* Some court, somewhere, has to conduct an adversarial gatekeeping hearing to determine the reliability of the given scientific theory and its methodology. *Id.* There is no "bright line" judicial rule for when a scientific theory or technique becomes so widely accepted or persuasively proven that future courts may take judicial notice of its reliability. *Id.* at n. 6. However, if the Court of Criminal Appeals, this Court, or another Texas appellate court has al-

ready determined the validity of a particular scientific theory or technique, then the party offering the expert testimony need not satisfy *Kelly's* first two criteria. *See id.* at 27. The trial court and a reviewing court can rely upon prior opinions and take judicial notice of those findings. *See id.* at 31, n. 12.

### Texas Cases

Generally, blood spatter experts inspect the physical evidence to determine the injuries suffered and their location with respect to the other physical evidence. *Ex Parte Mowbray,* 943 S.W.2d 461, 462 (Tex. Crim.App.1996). Texas appellate courts have reviewed trials which included blood spatter testimony since the early 1980's when the intermediate appellate courts acquired criminal jurisdiction. *See Stanley v. State,* 664 S.W.2d 746, 749 (Tex.App.-San Antonio 1983, pet. ref'd) (County medical examiner used blood spatter to conclude victim was probably lying down when shot). The Court of Criminal Appeals has been reviewing this kind of evidence for a much longer period of time, since at least 1921. *See Pounds v. State,* 89 Tex.Crim. 273, 230 S.W. 683, 685 & 690 (1921) (Court wondered "with the quantity of blood spattered upon the fence and the water trough, how it could occur that if the spatters of blood were caused by a single kick from the jack, or more than one, that some spatters of blood were not found upon the legs or other portions of the jack's body.").

Since then there have been a plethora of cases in Texas involving the use of blood spatter analysis. Not all have reviewed challenges to the reliability of expert testimony.[2] Some have had the opportunity to conduct such a review but opted instead to conduct a harm analysis and found the admission of the testimony harmless. *See Franklin v. State,* No. 01–02–118–CR, 2003 WL 1563797, 2003 Tex.App. LEXIS 2575 (Houston [1st Dist.] March 27, 2003, no pet.)(not designated for publication); *Hall v. State,* 970 S.W.2d 137 (Tex.App.-Amarillo 1998, pet. ref'd).

The El Paso Court considered the admission of blood spatter testimony in 2000. *See Franco v. State,* 25 S.W.3d 26 (Tex. App.-El Paso 2000, pet. ref'd). The defendant was convicted of murder and sentenced to 99 years in prison. On appeal, the defendant argued that the trial court erred in admitting expert testimony concerning blood spatter analysis without either conducting a hearing outside the presence of the jury or requiring the State to show by clear and convincing evidence that the blood spatter evidence was relevant and reliable. *Id.* at 29. A majority of the El Paso Court determined that the State conceded error but argued that the admission of the blood spatter evidence was harmless because such evidence had been

---

2. *See, e.g. Routier v. State,* 112 S.W.3d 554 (Tex.Crim.App.2003); *Mosley v. State,* 983 S.W.2d 249 (Tex.Crim.App.1998); *Thompson v. State,* No. 12–01–00019–CR, 2003 WL 174097, 2003 Tex.App. LEXIS 826 (Tyler, January 22, 2003, no pet.)(not designated for publication); *Abrams v. State,* No. 14–00–01295–CR, 2002 WL 58822, 2002 Tex.App. LEXIS 333 (Houston [14th Dist.] January 17, 2002, pet. ref'd)(not designated for publication); *Russell v. State,* No. 13–00–00720–CR, 2001 WL 34394334, 2001 Tex.App. LEXIS 5636 (Corpus Christi August 16, 2001, no pet.)(not designated for publication); *State v. Burgess,* No. 03–99–00316–CR, 1999 WL 1023910, 1999 Tex.App. LEXIS 8450 (Austin November 12, 1999, no pet.)(not designated for publication); *Evans v. State,* No. 09–97–159 CR, 1999 WL 22609, 1999 Tex.App. LEXIS 362 (Beaumont January 20, 1999, no pet.)(not designated for publication); *Horinek v. State,* 977 S.W.2d 696 (Tex.App.-Fort Worth 1998, pet. ref'd); *Taylor v. State,* No. 05–94–01917–CR, 1997 WL 282550, 1997 Tex.App. LEXIS 2831 (Dallas May 29, 1997, no pet.)(not designated for publication).

admissible as scientific evidence since 1987. *Id.*

In dicta, the court mused:

We can envision circumstances where the trier of fact may be quite properly aided by some evidence of blood splatter analysis, but we are dubious of the claim in this record that blood spatter evidence can 'determine the aftermath of a violent incident of bloodshed and to try to determine the location of individuals before, during and after bloodshed and to try to determine, perhaps, a sequence of events that occurred based upon the bloodstain evidence available at the scene.'

*Id.* The court further surmised that even if blood spatter analysis was scientifically valid, it may be unhelpful for some other reason. *Id.* The court could find "nothing in the blood spatter analysis from which any 'expert' could draw an opinion as to who was (or who was not) the initial aggressor, an opinion repeatedly made and emphasized in this case." *Id.* at 30. That would have been an appropriate case, on proper objection, for the trial court to determine if the theory had been properly applied on the specific occasion. But without specifically holding that the admission of the testimony was error, presumably because the majority believed the State conceded error, the court went on to conduct a harm analysis and held that the admission of the testimony was harmless. *Id.* at 31.

As early as 1987, the First Court of Appeals in Houston and the Corpus Christi Court reviewed challenges to expert testimony in blood spatter analysis and held the testimony to be admissible. *See Lewis v. State,* 737 S.W.2d 857, 861 (Tex.App.-Houston [1st Dist.] 1987, pet. ref'd); *Cortijo v. State,* 739 S.W.2d 486,

489 (Tex.App.-Corpus Christi 1987, pet. ref'd). In a post *Daubert/Kelly* opinion, the Court of Criminal Appeals found testimony about blood spatter analysis admissible in light of a Rule 702 challenge. *Alvarado v. State,* 912 S.W.2d 199, 215–216 (Tex.Crim.App.1995). It appears, however, that only the First Court reviewed extensive testimony about the expert's qualifications and the reliability of the field of blood spatter analysis. The First Court also took judicial notice that courts around the country had considered blood spatter analysis a proper subject for expert testimony. *See Lewis,* 737 S.W.2d at 860 (citing *State v. Melson,* 638 S.W.2d 342 (Tenn. 1982); *State v. Hilton,* 431 A.2d 1296 (Me. 1981); *People v. Erickson,* 89 Ill.App.3d 56, 44 Ill.Dec. 138, 411 N.E.2d 44 (1980); *People v. Carter,* 48 Cal.2d 737, 312 P.2d 665 (1957)).

In *Lewis,* the expert, Herbert MacDonnell,[3] testified that he (1) was a criminologist; (2) had degrees in physics and chemistry; (3) had been employed as a chemistry professor and an industrial chemist; (4) had studied blood stain characteristics since 1954; (5) had performed thousands of lab experiments; (6) had studied under a well-known criminologist; and (7) had testified in 26 states on blood spatter. *Lewis,* 737 S.W.2d at 860. The trial court further heard that the field of blood spatter analysis was not particularly novel, as blood acts as any other liquid when dropped, smeared or spattered. *Id.* And blood analysis borrows techniques from chemistry, physics, math, and biology. *Id.* MacDonnell also testified that he was aware of many others who studied in this field. *Id.* at 861. Based on this testimony, the First Court determined that "MacDonnell's studies are based on gen-

---

**3.** This particular expert has been characterized as the pre-eminent authority on the sci-

ence of blood spatters. *Ex Parte Mowbray,* 943 S.W.2d 461, 462 (Tex.Crim.App.1996).

eral principles of physics, chemistry, biology, and mathematics, and his methods use tools as widely recognized as the microscope; his techniques are neither untested nor unreliable. We hold that MacDonnell's testimony was properly admitted." *Id.*

As recently as last March, the First Court acknowledged its long-standing recognition of the validity of blood spatter analysis. *See Franklin v. State,* No. 01–02–00118–CR, 2003 WL 1563797, *5–*6, 2003 Tex.App. Lexis 2575, *14 (Houston [1st Dist.] March 27, 2003, no pet.)(not designated for publication).

In *Alvarado,* the defendant argued to the Court of Criminal Appeals that the admission of testimony about blood spatter analysis violated Texas Rule of Criminal Evidence 702[4] because the officer testifying was not qualified as an expert in any recognized discipline. *Alvarado,* 912 S.W.2d at 215. Before the trial court decided to admit the officer's testimony, the officer stated that:

> bloodstain pattern interpretation involved the visual examination of bloodstains on various types of surfaces for the purpose of determining how the bloodstains were deposited; bloodstain pattern interpretation was based on general principles of physics and mathematics; he had received more than 60 hours of training in the subject from the Houston and El Paso police departments; he had read a book on the subject; and the methods he used in his interpretation of bloodstains were of the type relied upon by experts in the field.

*Id.* After a general analysis under Rule 702, the Court held that the trial court did not abuse its discretion in admitting the testimony because, on the record before the trial court, the trial court could have reasonably found that: (1) the officer, because of his training, was qualified as an expert on blood spatter analysis; (2) lay persons were not qualified to the best possible degree to interpret blood spatter and, therefore, expert testimony on the subject was generally appropriate; and (3) the officer's specialized knowledge would actually assist the jury in the defendant's case in determining his guilt or innocence. *Id.* at 216.

Thus, according to the majority opinion in *Hernandez,* the trial court could, and we can, take judicial notice of *Lewis,* and possibly *Alvarado,* and use those opinions as support for the first two criteria of *Kelly. See Hernandez v. State,* 116 S.W.3d 26, 27 and 31, n. 12 (Tex.Crim.App.2003).

But the majority in *Hernandez* noted that judicial notice cannot serve as the sole source of support for a bare trial record concerning scientific reliability. *Id.* at 31–32. The record in this case is not bare as was the record in *Hernandez.* Whereas the expert in *Hernandez* could not testify about the theories and techniques surrounding the ADx machine, January testified about the theory and techniques of blood spatter analysis.

### Alternative

█ Even if we cannot rely solely on *Lewis* and *Alvarado,* Presiding Judge Keller has provided us with a more definitive approach to determining when we can take judicial notice of the reliability of a scientific theory or technique. *Hernandez v. State,* 116 S.W.3d 26, 32–42 (Tex.Crim.App.2003)(Keller, P.J., concurring). Under the alternative analysis, the reliability of a scientific theory or technique can be judicially noticed in three ways: (1) when it is a matter of common knowledge, (2) when widely available court decisions show that reliability has been

---

4. Now Texas Rule of Evidence 702.

litigated elsewhere in fact-finding forums to a degree sufficient for the appellate court to conclude that reliability is well-established, and (3) when a prior determination of reliability has been made by an appellate court whose pronouncements are binding in the jurisdiction. *Id.* at 32.

Other jurisdictions across the country have discussed the admissibility of blood spatter evidence. We will review these out-of-state opinions, as well as the Texas opinions, in light of the criteria for judicial notice as described in the concurring opinion in *Hernandez*. *Hernandez v. State,* 116 S.W.3d 26, 32–42 (Tex.Crim.App.2003)(Keller, P.J., concurring).

*(1) Common Knowledge*

██ Some scientific theories and techniques are so well known that they are matters of common knowledge and judicial notice may be taken without a fact finding hearing and without consulting any scientific literature. *Id.* at 34–35. Examples of theories and techniques that are now a matter of common knowledge include the laws of thermodynamics and the uniqueness of fingerprints and DNA. *Id.* at 35.

Experts have testified that blood spatter analysis is based on the general principles of chemistry, physics, biology, and mathematics. *See e.g. Alvarado v. State,* 912 S.W.2d 199, 215 (Tex.Crim.App.1995); *Lewis v. State,* 737 S.W.2d 857, 860 (Tex. App.-Houston [1st Dist.] 1987, pet. ref'd). At least two courts have determined blood spatter analysis to be a matter of common knowledge.

In *State v. Hall,* the Iowa Supreme Court began its analysis with determining that the *Frye*[5] test of "general scientific acceptance" was not a prerequisite to the admission of evidence if the reliability of the evidence is otherwise established. *State v. Hall,* 297 N.W.2d 80, 85 (Iowa 1980). In *Hall,* the evidence offered to show the reliability of blood spatter analysis included:

(1) the witness's considerable experience and his status as the leading expert in the field; (2) the existence of national training programs; (3) the existence of national and state organizations for experts in the field; (4) the offering of courses on the subject in several major schools; (5) use by police departments throughout the country in their day-to-day operations; (6) the holding of annual seminars; and (7) the existence of specialized publications.

*Id.* Compared to other scientific techniques, the Iowa Court found the study of blood characteristics to be relatively uncomplicated. *Id.* at 86. It also did not see a distinction between this technique and other areas of expert testimony that is readily received, such as ballistics, fingerprints, and blood types. *Id.* The Court then concluded that the foundation evidence of reliability and the inherent understandability of blood spatter analysis provided a sufficient basis for its admission. *Id.*

In *People v. Clark,* the defendant argued that testimony regarding blood spatter analysis did not meet the criteria of the *Frye* test. *People v. Clark,* 5 Cal.4th 950, 22 Cal.Rptr.2d 689, 857 P.2d 1099, 1142 (1993). The California Supreme Court determined that the testimony raised none of the concerns addressed by *Frye*. *Id.* It

5. *Frye v. United States,* 293 F. 1013 (D.C.Cir. 1923). The primary focus in *Frye* was an analysis of whether a particular scientific theory was novel or had been widely accepted. Although this is no longer the focus under a Rule 702 reliability analysis, *Frye* and its progeny provide a useful framework for identifying when something is properly considered common knowledge.

further determined that "The methods employed are not new to [science] or the law, and they carry no misleading aura of scientific infallibility." *Id.* (citing *People v. Stoll,* 49 Cal.3d 1136, 265 Cal.Rptr. 111, 783 P.2d 698 (1989)). The Court concluded that blood spatter analysis is a matter of common knowledge, readily understood by the jury, that blood will be expelled from the human body if it is hit with sufficient force, and that inferences can be drawn from the manner in which the expelled blood lands upon other objects. *Id.*

### (2) Consideration in other Courts

■■ Under the second manner which judicial notice may be taken, if the trial court in the case under consideration on appeal did not conduct an extensive evidentiary hearing, that trial court or an appellate court reviewing the case can use the decisions of other appellate courts that had the benefit of an extensive reliability hearing held at trial. *Hernandez v. State,* 116 S.W.3d 26, 35 (Tex.Crim.App.2003)(Keller, P.J., concurring). But a less exacting inquiry should be required if a large number of jurisdictions recognize the validity or reliability of a scientific theory or technique. *Id.* at 37. A court could take judicial notice based upon the great weight of authority. *Id.*

In addition to the First Court's opinion in *Lewis,* the courts of other states have reviewed or conducted extensive reliability hearings on the validity of blood spatter analysis. In 1983, the Oklahoma Court of Criminal Appeals reviewed such a hearing. *See Farris v. State,* 670 P.2d 995 (Okla.Cr. 1983). In *Farris,* the defendant argued on appeal that testimony of blood spatter analysis at the scene of the crime was reversible error because that analysis was not a recognized forensic science. *Id.* at 997. The Court noted:

The geometric Blood Stain Interpretation is a method used to reconstruct the scene of the crime. Blood stains are uniform in character and conform to the laws of inertia, centrifugal force and physics. Study of the blood pattern along with its size and shape helps determine the source of the blood and any movement that might have occurred after the bloodshed began, including subsequent violent attacks upon the victim.

*Id.* The defendant challenged the reliability of the technique and its acceptance in the scientific community. The trial court held an in-camera hearing. At that hearing, the trial court found that geometric blood stain interpretation is a forensic science which is recognized by the Federal Bureau of Investigation, New Scotland Yard, and the Oklahoma Bureau of Investigation. *Id.* The court also found that the manual on the subject, published by the Department of Justice, was entitled FLIGHT CHARACTERISTICS AND STAIN PATTERNS OF HUMAN BLOOD. *Id.* After a review of the hearing, the Oklahoma Court of Criminal Appeals held that the trial court properly admitted the expert witness testimony. *Id.* at 998. Many years later, the Oklahoma Court continued to recognize the propriety of expert testimony on blood spatter analysis. *See Romano v. State,* 909 P.2d 92, 111–112 (Okla.Cr.1995).

The North Carolina Supreme Court has also accepted blood spatter analysis as a valid scientific technique. *See State v. Goode,* 341 N.C. 513, 461 S.E.2d 631 (1995). In *Goode,* the defendant contended that blood spatter analysis was not an appropriate area for expert testimony because it had not been established as scientifically reliable. *Id.* at 641. The North Carolina Supreme Court observed that the expert witness, a forensic serologist, testified extensively on voir dire concerning the reliability of blood spatter analysis. *Id.* The witness testified:

... that bloodstain pattern interpretation is a "specialized crime scene technique" wherein a specially trained individual studies the blood and the types of stains at the scene of the crime, and then, based upon his knowledge of similar bloodstain characteristics and reproductions of the crime scene, he forms an opinion about "what actually occurred [at] the crime scene." In order to determine what occurred at the crime scene using this method of proof, experts rely upon specific categories of bloodstains which are defined by the way in which they are made. These categories can be established through observation and reconstruction, as similar stains are produced under similar circumstances.

*Id.* After reviewing the witness's testimony, the North Carolina Supreme Court concluded that blood spatter analysis was an appropriate area for expert testimony. *Id.* The Court also supported its conclusion by recognizing that it had implicitly accepted blood spatter analysis as a scientific method of proof in another case and that appellate courts in other jurisdictions had done the same. *Id.* at 641–642.

In *State v. Melson*, the expert testimony was sought to explain the pattern of blood stains which were spread over the defendant's shirt and pants, from top to bottom, as well as to some extent on his cap and boots. *State v. Melson*, 638 S.W.2d 342, 363 (Tenn.1982). The defendant objected to the recognition of this area of expertise in Tennessee. *Id.* The expert testified that he had participated in the investigations of many crimes, published many writings, conducted numerous seminars, and conducted research over a long period of years in forensic science in general and, in particular, the principles of physics as applied to blood patterns. *Id.* The defense argued that none of the expert's experiments in blood pattern analysis had been carried out on humans, but only on animals. *Id.* However, the Tennessee Supreme Court noted that the crimes which the expert had investigated involved humans. Further, the Court observed that the expert testified that "in physics it makes very little difference as to what the origin of the blood is—whether it is polyurethane soaked with blood or it is a human hand—it really doesn't matter. You transfer energy to blood hydrostatically and you get an eruption of blood spatters." *Id.* at 364.

The defense also urged that there was no such area of expertise as "blood stain patterns." But the Supreme Court was satisfied with the validity of the field, stating:

> [A]lthough a field may be narrow, there may certainly be persons who are experts therein. Certainly there are fewer experts in, for example, nuclear physics than there are in fingerprint identification, but the narrowness of a field should not preclude the testimony of one who has proved his expertise therein to the satisfaction of the trial court in the reasonable exercise of his discretion. In any case, the witness testified that he had trained over 300 people in the area; and that there were others (including the defense's chosen expert) who were also training people. The subject has been written on as far back as 1898, and the witness knew of over a hundred reference works. As the witness said, "there are other people who testify [as blood pattern experts]. I am one of the few and I certainly wouldn't say that there are a large number, but there is an ever increasing number."

*Id.* The Court then found that the expert's testimony was clear, understandable, and accompanied by demonstrations to the jury. *Id.* And it was obvious to the Court he knew about what he spoke and that he

was clearly competent to give the testimony which he gave. *Id.*

Other jurisdictions have found the scientific technique of blood spatter analysis to be reliable although with no hearing outside the presence of the jury, less than extensive testimony about reliability at the trial court level, or less than extensive review of the testimony at the trial court. In *State v. Moore*, the defendant argued that the State failed to establish the reliability and general acceptance of blood spatter analysis. *State v. Moore*, 458 N.W.2d 90, 96 (Minn.1990). At trial, the expert gave the following explanation of blood spatter analysis:

> During blood[-]splattering interpretation we look at the actual droplets of blood that have been shed on a crime scene. Blood has characteristics that abide by the law of physics when blood is shed, whether it is from a stabbing, bludgeon or gunshot wound.
>
> When a drop of blood is shed it undergoes certain patterns. If it is dropped straight up and down and lands on a surface, it will leave a perfectly round pattern.
>
> As the angle increases the blood splatter or droplets of blood as they strike something will become longer or narrower. There is a mathematical correlation between the length and the width of these blood splatters that can be measured. We can then determine what angle they came in at and by using a set of strings and thumbtacks and large protractor we are able to reconstruct the scenes of crimes many times and actually place people where they were at the time they were injured * * * or shot.
>
> ... [B]lood splatter interpretation [is] a generally accepted technique within the scientific community.

*Id.* at 97. Relying, in part, on the testimony of the witness and the fact that other jurisdictions had not required a substantial foundation to be laid, the Minnesota Supreme Court held that the State sufficiently established that blood spatter analysis is generally accepted in the scientific as well as judicial community. *Id.* at 98.

In *Hampton v. State*, the defendant complained on appeal that the trial court improperly allowed expert testimony on blood spatter analysis because, he contended, it is not generally recognized as reliable. *Hampton v. State*, 588 N.E.2d 555, 557 (Ind. Ct.App. [1st Dist.] 1992). The witness testified:

> ... blood is different from other liquids in that it consists of cells and has strong molecular bonds. As a result, when blood hits an object, it will show a definite directionality. If the blood hits at a 90 degree angle, it will show a circular spot; but if it hits at an angle different from 90 degrees, it will "tail" in the direction the blood is moving.
>
> Blood spatter analysis may be reduced to common, fundamental sciences, such as mathematics, chemistry, and physics. Because of its physical properties, blood which has been put in motion reacts in a certain, predictable manner when it hits a surface.

*Id.* at 558. The Court concluded that the evidence was shown to be sufficiently reliable. Relying on *Hampton*, the Indiana Supreme Court came to the same conclusion. *James v. State*, 613 N.E.2d 15, 22 (Ind.1993).

In *State v. Knox*, the defendant asserted on appeal that blood spatter analysis is not an admissible area of expertise and that the State failed to lay a proper foundation to establish its reliability. *State v. Knox*, 121 Ill.App.3d 579, 76 Ill.Dec. 942, 459 N.E.2d 1077, 1080 (Ill.App. 3rd Dist.1984). Because an Illinois court had not yet taken judicial notice of the reliability of blood

spatter analysis, the State was required to show that the evidence was based on a well-recognized scientific principle or technique. *Id.* Based on the witness's testimony, the appellate court determined that the evidence was not of such a complex nature as to require a more detailed foundation than what was provided. *Id.* at 1081. The court then held that the trial court was provided sufficient information to make an informed decision regarding the reliability of the blood spatter analysis. *Id.* Three years later, a different appellate court, finding that no Illinois court had taken judicial notice of the reliability of blood spatter analysis, determined that the State provided insufficient evidence of scientific reliability. *State v. Owens,* 155 Ill.App.3d 990, 108 Ill.Dec. 511, 508 N.E.2d 1088, 1094 (1987) ("The evidence regarding the scientific reliability of Knight's blood-spatter testimony fell far short of that presented in *Knox,* the sole Illinois case in which evidence of blood-spatter analysis has been held admissible.").

An appellate court in Ohio found that the reliability of blood spatter analysis was sufficiently established by the expert witness. *See State v. Deel,* No. 11–062, 1986 WL 11203 *18, 1986 Ohio App. Lexis 8575 *48 (11th Dist. September 30, 1986)(not designated for publication). After testifying to her qualifications, the expert witness testified on voir dire that blood spatter analysis was taught in a forensic biology class which she attended at Ohio University. *Id.* at *17, 1986 Ohio App. Lexis 8575 at *46. The court found that the voir dire examination also revealed recognized authorities in blood spatter analysis and publications on the subject. *Id.* "The very fact that there are publications, seminars, and recognized experts in the field of blood-stain pattern analysis indicates its reliability, in general." *Id.* The court also used the *Hall* opinion from Iowa as additional support for its determination that reliability

ty was sufficiently established. *Id.* (citing *State v. Hall,* 297 N.W.2d 80 (Iowa 1980)).

Still, other jurisdictions have taken judicial notice of the field's reliability without noting any kind of hearing at the trial court. The Alabama Court of Criminal Appeals observed that the *Lewis* court took judicial notice of the "general acceptance" of blood spatter analysis. *Robinson v. State,* 574 So.2d 910, 918 (Ala.Crim. App.1990) (citing *Lewis v. State,* 737 S.W.2d 857, 860 (Tex.App.-Houston [1st Dist.] 1987, pet. ref'd)). The Court also observed that other jurisdictions, without a discussion of the general scientific acceptance test, have held blood spatter analysis to be admissible. *Id.* The court concluded, "... whichever approach is taken, testimony concerning blood spatter interpretation is admissible." *Id.*

The Supreme Court of Idaho granted a defendant's petition for review primarily to consider the admissibility of the interpretation of blood spatter evidence. *Idaho v. Rodgers,* 119 Idaho 1047, 812 P.2d 1208, 1210 (1991). The Court noted that "[b]lood spatter analysis is clearly a well-recognized discipline, based upon the laws of physics, which undoubtedly assisted the jurors in understanding what occurred the night [the victim] was murdered." *Id.* at 1212. Relying on specific cases, the Court then held that "[g]iven the widespread acceptance of this evidence by other courts, and the fact that Rule 702 favors admissibility of expert testimony, we uphold the trial court's discretionary decision to admit blood spatter evidence." *Id.*

Recently, the Virginia Supreme Court re-examined the admissibility of blood spatter analysis. *See Smith v. Commonwealth,* 265 Va. 250, 576 S.E.2d 465 (Virginia 2003). It observed that the Court had previously held blood spatter analysis to be admissible and had rejected a con-

tention that blood spatter analysis was not reliable. *Id.* at 467 (citing *Compton v. Commonwealth*, 219 Va. 716, 250 S.E.2d 749, 756 (1979) and *Stewart v. Commonwealth*, 245 Va. 222, 427 S.E.2d 394, 406 (1993)). The Court remarked that many of the specific physical elements of blood spatter analysis are capable of being tested using the laws of physics and chemistry, and by employing principles of gravity, inertia, and viscosity. *Id.* In accordance with other jurisdictions, the Court adhered to the view that blood spatter analysis can form a basis for admissible proof and held that the trial court did not err in determining blood spatter analysis was a reliable science. *Id.*

As late as 1995, the admissibility of blood spatter analysis was one of first impression for the State of Michigan. *People v. Haywood*, 209 Mich.App. 217, 530 N.W.2d 497, 500 (1995). After reviewing case law from other jurisdictions, the Michigan court concluded:

> In our view, the scientific principles underlying the interpretation of bloodstains are neither novel nor untested. Rather, this evidence is based upon established principles of physics, biology, chemistry, and mathematics. Given the overall recognition of this technique in other jurisdictions, we hold that the trial courts may take judicial notice of the general acceptance of such evidence by the scientific community.

*Id.* at 501.

In *State v. Roberts*, the Washington Supreme Court analyzed the admissibility of blood spatter testimony under *Frye*[6] and its "ER 702." *State v. Roberts*, 142 Wash.2d 471, 14 P.3d 713, 740–741 (2000). The Court found that blood spatter analysis "hardly" qualified as a novel scientific

technique. *Id.* at 740. The Court also reviewed opinions from other jurisdictions and discovered that many had held blood spatter analysis either met the *Frye* standard or did not implicate it at all. The Washington Court then concluded, "Blood splatter testimony is not a new method of scientific proof and, therefore, need not be subjected to the *Frye* analysis." *Id.* at 741. Under its rule 702, the Court noted that blood spatter testimony had been admitted by other jurisdictions under similar rules of evidence and concluded the expert's testimony was admissible. *Id.*

In New York, relying on case law from within the State and from other jurisdictions, two appellate courts found blood spatter analysis evidence to be scientifically reliable. *People v. Whitaker*, 289 A.D.2d 84, 734 N.Y.S.2d 149 (2001); *People v. Barnes*, 267 A.D.2d 1020, 701 N.Y.S.2d 201 (1999).

### Unreliable?

Have any courts held blood spatter analysis to be invalid? The short answer is no. As noted earlier, the El Paso Court skipped the reliability question and held the admission of the testimony was harmless. *Franco v. State*, 25 S.W.3d 26 (Tex. App.-El Paso 2000, pet. ref'd). An Illinois court of appeals held blood spatter analysis to be inadmissible only because the State did not prove reliability. *State v. Owens*, 155 Ill.App.3d 990, 108 Ill.Dec. 511, 508 N.E.2d 1088, 1094 (1987). And in Maine, the expert testified that he could determine the *order* of the gunshots by analyzing blood spatters. *State v. Philbrick*, 436 A.2d 844 (Me.1981). Because the trial court held no hearing and had no evidence before it at all to demonstrate the field's reliability, the Supreme Court held that the trial court erred in admitting the specific testimony. *Id.* at 861. The Su-

---

**6.** *Frye v. United States*, 293 F. 1013 (D.C.Cir. 1923).

preme Court did not conduct a comprehensive review or go out and look for any support of the reliability of blood spatter analysis from other jurisdictions.

None of these courts held that, after an extensive hearing, blood spatter analysis was unreliable. The courts either avoided the question or had nothing in the record before them to make a determination.

### (3) Prior Determination of Reliability

■ Under the third alternative manner by which we may take judicial notice of a scientific theory or technique's validity or reliability, when it has been shown so convincingly before a fact-finder that an appellate court can conclude the matter should be judicially noticed, the appellate court can decree that the matter will henceforth be the subject of judicial notice. *Hernandez v. State*, 116 S.W.3d 26, 37 (Tex.Crim.App.2003)(Keller, P.J., concurring). In such instances, judicial notice of the reliability of the scientific theory or technique can then be taken by trial and appellate courts within the decreeing court's jurisdiction in future cases in which the issue arises. *Id.*

*Lewis* appears to be the case on point under this category of judicial notice. However, this Court is not within the First Court's jurisdiction. Thus, under this alternative, we cannot rely on *Lewis* as a prior determination of the reliability of blood spatter analysis.

### Conclusion

Under either the majority's analysis in *Hernandez* for judicial notice or the second alternative method for taking judicial notice delineated by Presiding Judge Keller in her concurring opinion, we take judicial notice of the validity of blood spatter analysis and hold that the State was not required, and will not be required in the future, to produce evidence on the first two criteria of *Kelly*.

### THIRD CRITERIA

But what about *Kelly's* third criteria—whether the technique was properly applied on the occasion in question? As was stated earlier, Holmes did not ultimately contest this criteria, and we will not review it. We note that it is necessarily a case specific inquiry.

### CONCLUSION

Because we take judicial notice of the validity of blood spatter analysis and the State proved the proper application of blood spatter analysis, the trial court did not err in admitting January's testimony. Holmes's issue regarding this is overruled.

### PRIOR DRUG USE

■ Lastly, Holmes contends the trial court erred in admitting evidence of Holmes's prior drug use under the theory that Holmes had opened the door to such evidence. He further contends that the State initially raised the issue which Holmes later attempted to explain during cross-examination.

Leroy Hughes testified that Holmes had been to a rehabilitation center to "get off drugs." Holmes objected to the reference to an extraneous bad act of previously being on drugs. The State contends that Holmes has not preserved his complaint for appeal because he allowed similar evidence to be admitted later. We agree. On re-direct examination, Hughes agreed that he had previously testified that Holmes was in rehabilitation because of a drug addiction. When asked about the kind of drugs Holmes was addicted to, Hughes responded, "Crack." No objection was made to this testimony.

■ To preserve a complaint for appellate review, the objecting party must continue to object each time the objectionable evidence is offered. *Fuentes v. State*, 991

S.W.2d 267, 273 (Tex.Crim.App.1999); *Desselles v. State*, 934 S.W.2d 874, 876–877 (Tex.App.-Waco 1996, no pet.). Because Holmes did not object to Hughes's second reference to drugs, Holmes has not preserved his complaint for our review. This issue is overruled.

### CONCLUSION

Having overruled each issue on appeal, we affirm the judgment of the trial court.

Justice VANCE concurring.

BILL VANCE, Justice, concurring.

I reach the same result as the majority—affirming the judgment.

### BLOOD SPATTER EVIDENCE

My differences revolve largely around the majority's extensive discussion about, and implied criticism of, the manner in which Holmes preserved his complaint about the admission of expert testimony.

### *The Objection*

As the majority notes, Rule 702 requires *the proponent* of scientific evidence to prove, by clear and convincing evidence, that the evidence is both relevant and reliable. *Kelly v. State*, 824 S.W.2d 568, 573 (Tex.Crim.App.1992). To be considered reliable, evidence based on a scientific theory must satisfy three criteria: (1) the underlying scientific theory must be valid; (2) the technique applying the theory must be valid; and (3) the technique must have been properly applied on the occasion in question. *Hartman v. State*, 946 S.W.2d 60, 62 (Tex.Crim.App.1997) (citing *Kelly*, 824 S.W.2d at 573); *see also Weatherred v. State*, 15 S.W.3d 540, 542 (Tex.Crim.App. 2000). Under Texas Rule of Evidence 104(a) and (c) and Rule 702, all three criteria must be proven to the trial court, outside the presence of the jury, before the evidence may be admitted. *Kelly*, 824 S.W.2d at 573.

The majority mistakenly asserts that Holmes "ultimately did not contest" whether Detective January properly applied blood spatter technique on the occasion in question and refuses to address the issue. In so saying, the majority ignores an objection made when the testimony was admitted during trial—quoted earlier in its own opinion: "... there has been no showing of [the] technique being properly applied on the occasion in question prior to us coming on the record in front of the jury." Majority Opinion at 184–85.

"As regards specificity, all a party has to do to avoid the forfeiture of a complaint on appeal is to let the trial judge know what he wants, why he thinks himself entitled to it, and to do so clearly enough for the judge to understand him at a time when the trial court is in a proper position to do something about it." *Lankston v. State*, 827 S.W.2d 907, 909 (Tex.Crim.App.1992).

A fair evaluation of the requirement for preservation of an objection to expert testimony in a criminal case should acknowledge that a criminal trial is different from a civil trial, particularly in the defendant's limited right to discovery. Prior to the expert's taking the stand, the nature of the proposed expert's testimony is not known in detail. No discovery has been allowed; no depositions have been taken. The defendant is entitled, upon motion and notice, to the name and address of an expert the state may use at trial. TEX.CODE CRIM. PROC. ANN. art 39.14 (Vernon Supp.2004). This puts defense counsel in a criminal case at more of a disadvantage than a lawyer objecting to the admission of expert testimony in the usual civil case. For example: How is counsel to know if the underlying scientific theory is objectionable until the state attempts to prove that it is valid in the hearing required outside the

presence of the jury? How is counsel to know whether the technique applying the theory is objectionable until the witness describes it for the judge in that hearing? How is counsel to know whether the expert's application of the technique on the occasion in question is objectionable until the witness relates how it was applied in that hearing? How is counsel to know whether the State has proven these matters by clear and convincing evidence until the state presents the testimony at the hearing? Because *the proponent* must satisfy the requirements of the rule, an objection that the proponent has not satisfied the predicate requirements of Rule 702 is sufficient to cause the court to hold the hearing out of the presence of the jury. *Jackson v. State,* 17 S.W.3d 664, 670 (Tex. Crim.App.2000). When Holmes again objected under Rule 702 to the admissibility of the testimony before the jury, his objection included all of the requirements of Rule 702. Rule 702 does not, contrary to the majority's assertion, require "very specific objections." Majority Opinion at 185.

Based on the extensive explanation advanced to demonstrate non-preservation, I fear that this case demonstrates a willingness to impose hyper-technical requirements on complaint preservation, at least in the area of expert testimony.

### Evidence of Reliability

Following *Alvarado,* I would hold that the trial court did not abuse its discretion in finding the first two criteria were satisfied, based on Detective January's testimony. *Alvarado v. State,* 912 S.W.2d 199, 215–16 (Tex.Crim.App.1995). In this, I agree with the majority. Majority Opinion at 184. For that reason, I cannot join the unnecessary discussion about judicial notice.

### Application of Technique

Detective January testified that the blood found on walls and a sofa probably got there from a wound gushing blood, or, if blood accumulated on a body, then when the body thrashed around, the blood flew to the walls and sofa. He said other blood on the floor dripped from a wound. Blood on a door frame came from someone bleeding who rubbed against it. He said there was a large amount of blood found throughout the crime scene.

I would find that the trial court did not abuse its discretion in finding that the third criterion was satisfied by Detective January's description of his application of the technique to the facts on the occasion in question.

The issue is properly overruled.

### EVIDENCE OF PRIOR DRUG USE

I also disagree with the majority's conclusion that the objection to the evidence of prior drug use was not preserved. The majority confuses "preservation" with the rule that "the erroneous admission of testimony is not cause for reversal, if the same fact is proven by other testimony not objected to." *Leday v. State,* 983 S.W.2d 713, 718 (Tex.Crim.App.1998).

We have written at least twice on this topic since *Leday* was decided. In *Horton v. State,* Chief Justice Davis wrote for a unanimous court:

> The State argues that any error arising from the admission of the evidence in question is "harmless or waived" because evidence of a similar nature was admitted without objection. The State's use of the term "waiver" in this instance has been rejected recently by the Court of Criminal Appeals as inaccurate. *See Leday v. State,* 983 S.W.2d 713, 718 & nns. 6–8 (Tex.Crim.App.1998). Under *Leday,* a trial court's action in improper-

ly "overruling an objection to evidence will not result in reversal when other such evidence was received without objection, either before or after the complained-of ruling." *Id.* at 716–18. In this situation, the court's improper action is "rendered harmless" by the admission of similar evidence without objection. *Id.* at 718–19 & nn. 6–8.

*Horton v. State*, 986 S.W.2d 297, 302 (Tex. App.-Waco 1999, no pet.). In *Haynes v. State*, citing *Leday*, we said, "The Court discussed whether the rule is one of waiver or harmless error, but did not definitively state which it is." *Haynes v. State*, 85 S.W.3d 855, 859 (Tex.App.-Waco 2002, no pet.). It is not a failure to preserve the complaint.

However, because the same evidence came in later without objection, this issue is properly overruled.

## CONCLUSION

Because I agree that the issues should be overruled, I concur in affirming the judgment.